IN THE
# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **George Ivan Lopez**, #CZ3198 | : | **FILED** |
| **Darien Houser**, #GC7509 | : | HARRISBURG, PA |
| **Gerald Watkins**, #DD5212 | : | |
| **Ralph Stokes**, #AY9034 | : | OCT 25 2021 |
| **Jose Uderra**, #CC3832 | : | *CO* |
| **Richard A. Poplawski**, #KB7354 | : | PER_____ |
| 1200 Mokychic Drive | : | DEPUTY CLERK |
| Collegeville, PA 19426 | : | |
| *Plaintiffs, jointly,* | : | |
| *and on behalf of a class of* | : | |
| *similarly situated persons,* | : | |
| | : | |
| *v.* | : | No. _____ |
| | : | |
| **John E. Wetzel**, former Secretary, | : | |
| **Jeffrey A. Beard**, former Secretary, | : | |
| **Martin F. Horn**, former Secretary, | : | |
| PA Department of Corrections | : | |
| 1920 Technology Parkway | : | |
| Mechanicsburg, PA 17050 | : | |
| *Defendants, individually,* | : | A Class Action |
| *and in their official capacities,* | : | § 1983 Civil Rights |
| & | : | |
| **PA Department of Corrections** | : | Jury Trial Demanded |
| 1920 Technology Parkway | : | |
| Mechanicsburg, PA 17050 | : | |

## Verified Complaint

### Introduction

It has been clearly established that prolonged isolation destroys minds. Modern science confirms what the Supreme Court acknowledged in the 19th century. The defendants here—three former Secretaries of Corrections and the Department itself—knew well the danger. Yet they kept the plaintiffs in soul-

obliterating lockdown for decades based upon nothing but dubious pretext . . . and left them no way out except for suicide.

The plaintiffs are human beings. Nothing about their capital sentences made them immune to the deleterious effects of solitary confinement. In the 33 years since a facial challenge to the conditions of their confinement was defeated in this circuit, a scientific and legal consensus has crystallized around conclusions that are no longer susceptible of credible dissent. In short, society's standards of decency have evolved.

In 2018, a class consisting of death-condemned prisoners was certified by this Court to seek equitable relief. *Reid v. Wetzel*, #18-cv-0176. Department officials recognized (but did not admit) their liability, and agreed to enact reforms on Pennsylvania's Death Row. But the settlement did not release the defendants.

So new representative plaintiffs have emerged from that same class, relying on identical facts, to finally vindicate their rights and press their entitlement to compensation. This is it. This is the challenge that has become sickly overripe during thousands of man-years spent in dehumanizing American torture chambers. May it please the Court to play its crucial role in the maturing of a flawed but ever-aspiring Nation:

### Jurisdiction and Venue

**1.** The plaintiffs bring this action under the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, Title II of the

Americans with Disabilities Act, and § 504 of the Rehabilitation Act.

**2.** This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

**3.** Venue is proper under 28 U.S.C. § 1391(b) because the defendants had their principal place of business in this district.

### Parties

**4.** Plaintiff George Ivan Lopez, #CZ3198, is a 62-year-old person who is currently incarcerated at State Correctional Institution ("SCI") Phoenix, located at 1200 Mokychic Drive, Collegeville, PA 19426. He was held in solitary confinement by the defendants for 23 years (from 1996 until Dec. 2019).

**5.** Plaintiff Darien Houser, #GC7509, is an adult person who is currently incarcerated at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, PA 19426. He was held in solitary confinement by the defendants for 13 years (from 2006 until Dec. 2019).

**6.** Plaintiff Gerald Watkins, #DD5212, is an adult person who is currently incarcerated at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, PA 19426. He was held in solitary confinement by the defendants for 23 years (from 1996 until Dec. 2019).

**7.** Plaintiff Ralph Stokes, #AY9034, is a 58-year-old person who is currently incarcerated at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, PA 19426. He was held in solitary confinement by the defendants for 32 years (from 1987 until Dec. 2019).

3

**8.** Plaintiff Jose Uderra, #CC3832, is a 54-year-old person who is currently incarcerated at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, PA 19426. He was held in solitary confinement by the defendants for 26 years (from 1993 until Dec. 2019).

**9.** Plaintiff Richard A. Poplawski, #KB7354, is a 35-year-old person who is currently incarcerated at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, PA 19426. He was held in solitary confinement by the defendants for eight years (from 2011 until Dec. 2019).

**10.** Defendants Wetzel, Beard, and Horn were Secretaries of the Pa. Department of Corrections, with a primary business address at 1920 Technology Parkway, Mechanicsburg, PA 17050.

**11.** Defendants Wetzel, Beard, and Horn were responsible for the overall management and operation of the Department and for protecting the constitutional rights of all individuals in its custody, including the plaintiffs.

**12.** Defendants Wetzel, Beard, and Horn determined rules, regulations, and policies regarding management and overall operation of the Department, including the units that housed the plaintiffs. They authorized or condoned the policy of housing the plaintiffs in solitary confinement indefinitely and without rationale. Thus, they directly and proximately caused the violations below.

**13.** Defendants Wetzel, Beard, and Horn were acting under color of state law; they are sued in their official capacities for declaratory relief and in their

individual capacities for monetary damages.

**14.** Defendant Wetzel was Secretary from 2010–2021; Defendant Beard was Secretary from 2001–2010; Defendant Horn was Secretary from 1995-2000.

**15.** Defendant Pa. DOC is an agency of the Commonwealth that houses persons serving sentences of incaceration.

**16.** The address of the DOC's central office is listed above.

### Statement of Facts
### A. Conditions and Circumstances of Plaintiffs' Confinement

**17.** The defendants housed death-condemned prisoners at SCI Graterford in Collegeville, PA, and SCI Greene in Waynesburg, PA, until July 2018 when Graterford closed and the population was transferred to neighboring SCI Phoenix. Greene kept its capital population until 2020.

**18.** Pennsylvania law requires solitary confinement only "upon receipt of the [death] warrant." 61 Pa.C.S. § 4303.

**19.** Death warrants may not issue more than 60 days prior to execution. *Id.*

**20.** Despite the law, the defendants held the plaintiffs in solitary confinement *at all times* under former DOC Policy 6.5.8. "Capital Case Administration." (in exclusive possession of the defendants) (effective until 12/3/19).

**21.** The defendants housed the plaintiffs on Restricted Housing Units ("RHU"), which also housed a mixture of others prisoners segregated for disciplinary infractions or administrative reasons.

**22.** As residents of the RHU, the plaintiffs were subject to the gamut of

5

restrictive policies governing the operation of such units.

**23.** As residents of the RHU, the plaintiffs were subject to severe restrictions on personal property.

**24.** As residents of the RHU, the plaintiffs were subjected to mandatory weekly cell searches, where officers would routinely destroy and disorganize plaintiff's property.

**25.** As residents of the RHU, the plaintiffs were exposed to the incessant noise (e.g., banging, screaming), which pervades a unit that houses mentally ill inmates and convicts with disciplinary infractions.

**26.** As residents of the RHU, the plaintiffs were constantly exposed to the foul odors—feces, vomit, body odor, rotten food, sour milk—which pervade a unit that houses mentally ill inmates and convicts with disciplinary infractions

**27.** As residents of the RHU, the plaintiffs were issued clothing distinctive from general population (orange jumpsuits).

**28.** As residents of the RHU, the plaintiffs were issued "high-security" mattresses, which were inferior to those issued to general population and contributed to plaintiffs' sleep deprivation and physical ailments.

**29.** As residents of the RHU, the plaintiffs were served lesser-quality food than general population prisoners (e.g., processed patties in place of bone-in chicken legs).

**30.** The plaintiffs were held in single cells isolated from other prisoners.

**31.** The size of the plaintiffs' cells varied somewhat by institution, but were, on average, approximately 8 feet by 12 feet.

**32.** Each cell contained a sleeping platform, toilet, sink, and cabinets which left limited room for movement and exercise.

**33.** The plaintiffs were never given permanent cell assignments; rather, they were force to relocate every 90 days around the RHU, to which were often unsanitary.

**34.** As a result of the relocation practice, the plaintiffs suffered stress and endured a constant sense of instability.

**35.** On weekdays, the plaintiffs were confined to their cells for 22 hours per day.

**36.** The plaintiffs cells were illuminated by 24 hours per day.

**37.** During their time out-of-cell for "yard," the plaintiffs were permitted in small outdoor cages with concrete surfaces, not appreciably larger than their cells.

**38.** On holidays, weekends, and when weather was "inclement," the plaintiffs were confined to their cells for the entire day.

**39.** The plaintiffs were afforded three showers per week, always under close supervision of correctional staff.

**40.** The shower "door" in the RHU at SCI Graterford consisted of vertical prison bars and afforded no privacy to the naked occupant of the shower.

**41.** The shower "door" in the RHU at SCI Greene was made of see-through

mesh and afforded no privacy to the naked occupant of the shower.

**42.** The plaintiffs' only option for medical care was to accept cell-front consultations where medical confidentiality was impossible.

**43.** Despite being death-condemned prisoners, the plaintiffs access to the law consisted of a so-called "mini" law library on the RHU.

**44.** The plaintiffs' "mini" law library featured caged enclosures with desk-top computers (without word-processing functions) locked in security cabinets behind smudged or broken glass.

**45.** The selection of books in the "mini" law library was limited; the books that did exist were outdated and in poor condition.

**46.** The plaintiffs were barred from participation in any communal dining.

**47.** The plaintiffs were barred from participating in congregate religious activities.

**48.** The plaintiffs were barred from access to vocational training.

**49.** The plaintiffs options for employment were extremely restricted: few jobs were available.

**50.** The jobs that were available did not pay well enough to financially sustain the plaintiffs' needs for hygiene items, food, clothing, etc.

**51.** The plaintiffs were barred from access to education.

**52.** The plaintiffs were barred from participating in prison rehabilitative programming.

**53.** The plaintiffs were barred from participating in organized recreational activities.

**54.** Mental health assessments were conducted cell-front, and typically were perfunctory in nature, lasting only minutes.

**55.** The defendants' policies and practices denied the plaintiffs meaningful human contact for years.

**56.** To communicate with neighboring prisoners, the plaintiffs at SCI Greene and Phoenix had to shout through solid doors, air vents, or plumbing— exposing themselves to misconduct.

**57.** Those plaintiffs who had outside contacts were permitted three 15-minute telephone calls per week.

**58.** Those plaintiffs who had outside contacts were permitted one weekly, three-hour non-contact visit.

**59.** During these visits, the plaintiffs were separated from their visitor(s) by a solid plexiglass partition (often smudged or broken), and communicated by means of telephone.

**60.** When removed from their cell for *any reason*, the plaintiffs were subjected to mandatory strip searches.

**61.** Strip searches entailed the plaintiffs becoming fully nude, being required to "rake" the inside of their mouths with their own fingers, lifting their penises and testicles independently for inspection, bending over at the waist to

expose their anuses, and being required to squat and cough.

**62.** When removed from their cell for *any reason*, the plaintiffs were restrained by handcuffs behind their backs.

**63.** Affixed to the plaintiffs' handcuffs were nylon tethers indistinguishable from dog leashes, on which officers would apply pressure to direct and control plaintiffs' movement.

**64.** When *returned to* their cells, the plaintiffs were subjected to the same mandatory strip searches.

**65.** The plaintiffs remained in solitary confinement until the Department implemented Policy 7.5.1, "Administration of Specialized Inmate Housing," that went into effect December 3, 2019.

**66.** The plaintiffs bring this suit within two years of the defendants ceasing their continuing practice of violating the plaintiff's rights. *See Johnston v. Wetzel*, 431 F. Supp. 3d 666, n.7 (2019).

### B. Ordinary Incidents of Prison Life

**67.** The averments in this subsection do not apply to the plaintiffs, but to the baseline operations of general population ("G.P.") in the Pa. DOC under normal conditions.

**68.** Upon entering the DOC, every prisoner is given an individualized assessment and is subject to a classification procedure to determine the appropriate level of housing.

**69.** Even those classified to be housed at maximum security institutions (such as Greene, Graterford, and Phoenix) are subject to comparatively fewer restrictions.

**70.** G.P. prisoners can be subject to *limited periods* of solitary confinement only for specific reasons (e.g., disciplinary infractions, particular security threats).

**71.** G.P. prisoners live in dormitory or cell-block settings with constant opportunities to interact with one another.

**72.** G.P. prisoners are not generally forced to relocate within the prison at any regular intervals.

**73.** G.P. prisoners have comparatively expansive property privileges compared to those housed in RHU's.

**74.** G.P. prisoners' cells are not constantly illuminated.

**75.** G.P. prisoners generally may shower and shave on a daily basis.

**76.** G.P. prisoners have multiple, hours-long periods of congregate indoor/outdoor recreation per day.

**77.** G.P. prisoners have access to outdoor "main" yards which typically feature grassy areas, exercise equipment, etc.

**78.** G.P. prisoners have access to facility law libraries which are comparatively well-equipped with computers (featuring legal databases and word-processing software) and physical books.

**79.** Depending on the institution, G.P. prisoners are typically permitted to

make as many telephone calls as they can afford (even a restrictive institution such as SCI Phoenix permits three calls per *day*).

**80.** G.P. prisoners are permitted four contact visits per month, each of which may last as long as available space permits (typically up to 8 hours at some institutions).

**81.** G.P. prisoners are permitted to dine in a communal setting.

**82.** G.P. prisoners are permitted to participate in congregate religious activities at facility chapels.

**83.** G.P. prisoners have access to vocational training.

**84.** G.P. prisoners have a wide range of prison employment opportunities which can financially sustain them.

**85.** G.P. prisoners have access to education.

**86.** G.P. prisoners are permitted—indeed often required—to participate in corrective/rehabilitative programming.

**87.** G.P. prisoners are permitted to participate in organized recreational activity (e.g., team sports, music concerts, art projects).

**88.** G.P. prisoners receive their medical care at comparatively well-equipped infirmaries and medical triage wards, where they are afforded private consultations.

**89.** While G.P. prisoners are, of course, *eligible* to be strip-searched at any time, they are not subjected to mandatory strip-searching except in limited

circumstances (e.g., after outside hospital trips, contact visits, for a particular security-related threat).

### C. Individual Facts

**90.** Plaintiff George Ivan Lopez was incarcerated at SCI Graterford from 1996 until 2000, when he was transferred to SCI Greene. He stayed there until being sent to SCI Phoenix in February 2019.

**91.** Before becoming incarcerated, Lopez exhibited symptoms consistent with anxiety-borne Dissociative Fugue Disorder. *See* Psychiatic Evaluation by Stephen Mechanchik, M.D., 10/27/2000, at 7-8 (attached as exhibit A).

**92.** Lopez has massive free-floating anxiety. He suffers from distortions of sensation, including visual hallucinations, and daily passes through stages of inexplicable confusion. He is fearful, paranoid, occasionally self-aggressive, and copes with panic attacks, Post-Traumatic Stress Disorder, and insomnia. See generally *id.*; Psychological Evaluation by Anthony Pisa, Ph.D., 10/23/2000 (attached as exhibit B).

**93.** These psychiatric conditions were caused by Lopez's prolonged isolation and his conditions of confinement; his pre-existing ailments were exacerbated by the defendants' violations.

**94.** Lopez attempted suicide three times during the timeframe 2004–07.

**95.** Due to forced physical idleness, Lopez developed hypertension, severe joint stiffness and early-onset arthritis.

**96.** In addition to his psychiatric impairments, Lopez's disabilities include dyslexia and unspecified learning disorders.

**97.** Lopez's disabilities substantially interfere with his major life activities including his ability to care for himself, sleep, learn, read, think, concentrate, and communicate.

**98.** Defendant DOC had actual knowledge of Lopez's injuries and disabilities because of his prolific filing of inmate grievances and written requests (including Official Accomodation Request Forms, attached as exhibit C) alerting them to the issues, requesting amelioration of his conditions and specific accomodations for his disabilities.

**99.** Lopez has exhausted his administrative remedies in terms of seeking compensation for his injuries: he filed grievances and appealed them through all levels of review, but was ultimately denied.

**100.** Plaintiff Darien Houser was incarcerated at SCI Greene from 2006 until his transfer to SCI Phoenix in 2020.

**101.** Houser suffers from depression, acute claustrophobic panic attacks and generalized anxiety. His nightmares disrupt his sleep, and he's plagued by thoughts of physically harming himself.

**102.** These psychiatric conditions were caused by Houser's prolonged isolation and the conditions of his confinement.

**103.** Houser has physically harmed himself during his panic attacks by

14

and disabilities because of his prolific filing of inmate grievances and written complaints alerting them to the issues, requesting amelioration of his conditions, and seeking specific accomodations for his disabilities (e.g., handicapped-accessible showers).

**112.** Plaintiff Gerald Watkins was first placed in solitary confinement in 1996; shortly thereafter, he was transferred to SCI Greene, where he remained in isolation until 2020.

**113.** Watkins experienced anxiety, auditory hallucinations and acute paranoia. Watkins has endured sleep disturbances because of the lights/ flashlights, constant noise, and nightmares.

**114.** These psychiatric conditions were caused by Watkins' prolonged isolation and the conditions of his confinement.

**115.** When he was in isolation, Watkins would sometimes black out. He once woke up with facial lacerations and discovered that his cell was covered in his own blood.

**116.** Because of forced idleness, Watkins gained almost 100lbs. and suffers from back soreness, knee pain and headaches.

**117.** Watkins' obesity and orthopedic disabilities substantially interfered with major life activities, including: sleeping, learning, reading, concentrating. His persistent paranoia inhibits his ability to socialize and communicate.

**118.** The defendants had actual knowledge of the harms they were causing

16

Watkins and the ways that his disabilities inhibited him because he wrote request slips to the psychology department seeking accommodations (asking to be seen) and he wrote many inmate grievances and improvements in the conditions.

**119.** Plaintiff Ralph Stokes was at Graterford briefly in 1987 before being transferred to SCI Huntingdon where he spent about seven years. Once he was sent to SCI Green in 1994, he stayed there until 2020.

**120.** According to an Affidavit/Report of Jethro Toomer, Ph.D., Stokes has long suffered from cognitive, psychological, and emotional impairments as a result of organic brain damage and a car accident.

**121.** Stokes experiences erratic mood swings, has problems with impulse control, and is impaired in his ability to cope with stress. He is haunted by feelings of hopelessness and inadequacy; he is constantly depressed and anxious.

**122.** These psychiatric conditions were caused by Stokes' prolonged isolation and the conditions of his confinement; his pre-existing ailments were exacerbated by the defendants' violations.

**123.** Due to forced physical idleness and sleep deprivation (from lights being on all night), Stokes has decreased levels of energy; he's gained weight and now has type-II diabetes and hypertension.

**124.** Stokes' disabilities have substantially interfered with major life activities including his ability to care for himself, sleep, learn, read, think, concentrate, and communicate.

falling when attempting to reach the call buttons, ramming his head into doors and walls. (Department employees often ignored his emergency call button.)

**104.** During his attacks, Houser would lay on the floor, inhaling dust and dirt particles, gasping for what little air he could get from underneath his cell door, which was covered by rubber security strips.

**105.** Houser's psychiatric disabilities (anxiety and panic attacks) have substantially interfered with major life activities including breathing, sleeping, concentrating, thinking, and communicating.

**106.** Houser was wheelchair-dependent for 16 years (from 2004–2020) because of lower-body injuries that predate his incarceration.

**107.** Houser's physical disabilities have substantially interfered with life major life activies including his ability to sleep and care for himself.

**108.** Defendant DOC  discriminated against Houser because of his disability: he has been denied pain medication, reconstructive orthopedic surgery, physical therapy, and denied suitable access to wheelchair accessible handicapped showers.

**109.** Defendant DOC had actual knowledge of Houser's psychiatric injuries and disabilities because, over the course of years, he requested meaningful mental health treatment at PRC meetings.

**110.** PRC denied Houser's requests for meaningful psychiatric treatment.

**111.** Defendant DOC had actual knowledge of Houser's physical injuries

**125.** Stokes' ability to communicate in writing is particularly impaired, but the defendants had actual knowledge of the harms their conduct was causing Stokes, and of his disabilities, because he has filed grievances seeking improvements in his condition and routinely spoke with corrections officials, sharing his concerns and requesting equal treatment compared to other prisoners.

**126.** Stokes has exhausted his administrative remedies in terms of seeking compensation for his injuries: he filed a grievance and appealed it through all levels of review, but was ultimately denied.

**127.** Plaintiff Jose Uderra served a brief stint at SCI Graterford from 1993 to 1995. Then he was transferred to SCI Greene, where he stayed until being transferred back to Graterford in 2002. In February 2010, he returned to Greene, where he was kept until being shipped to Phoenix in 2020.

**128.** Uderra has been emotionally and spiritually desensitized. He suffers from anxiety, depression, mood disorders and sleep disturbances. Uderra is easily agitated and regularly irritable. He is paranoid, has lost interest in things he formerly enjoyed, and stuggles to maintain appetite and concentration. *See* Report of Julie B. Kessel, MD, dated 11/21/01 (attached as exhibit D).

**129.** These psychiatric conditions were caused by Uderra's prolonged isolation and the conditions of his confinement; his pre-existing ailments were exacerbated by the defendants' willful violations.

**130.** Uderra is self-mutilates and was caught attempting suicide in 2000.

**131.** Forced idleness has caused Uderra back problems and joint soreness, especially in his knees. He suffers from sciatica and headaches.

**132.** Uderra's anxiety, depression, mood disorders and insomnia interfere with major life activies: he is substantially inhibited in thinking, concentrating, reading, learning, socializing, and communicating.

**133.** The defendants knew of the harms they were causing Uderra and the ways that his injuries inhibited him: he has been on the Department's mental health roster since 2000. He's had several emergencies between 1996 and 2006 that landed him in mental health units, and has been on hunger strikes designed to secure accomodations and call attention to the atrocious conditions of his confinement.

**134.** Uderra has exhausted his administrative remedies in terms of seeking compensation for his injuries: he filed a grievance, appealed it through all levels of review, but was ultimately denied.

**135.** Plaintiff Richard A. Poplawski was incarcerated at SCI Graterford from July 2011 until his transfer to SCI Phoenix in June 2018.

**136.** While isolated, Poplawski suffered from bouts of severe depression and a constant, vague dread of impending catastrophe. He experienced mild perceptual distortions in the visual and tactile spheres (e.g., distorted depth perception, soft surfaces feeling rough or firm). His depression alternated with cycles of mania where his attention and energy would be fixated intensely and obsessively,

only to "crash" and leave him uninterested in completing tasks.

**137.** Poplawski relied on forced sleep to cope with his conditions, but his sleep cycle is prone to irregularity. He has chronic sleep inertia: he often remains disoriented and finds it difficult to fully awaken. But sometimes he awakens suddenly in a state of bewilderment and paranoid hypervigilance.

**138.** Poplawski found social isolation particularly painful. It took an enormous effort to maintain his sense of self in the absence of social comparison processes. *See* Haney Declaration at 23 (cited *infra*, ¶ 168). Poplawski's mind compensated by concocting social context in his dreams. But he still wonders how much of himself was lost—or never properly developed.

**139.** These psychiatric conditions were caused or exacerbated by Poplawski's prolonged isolation and the conditions of his confinement.

**140.** Poplawski has severe anxiety about qualified immunity.

**141.** Due to forced physical idleness and his psychiatric symptoms, Poplawski experienced cycles of rapid weight gain and loss. He had severe headaches and the general lethargy and apathy that accompanies hypersomnia.

**142.** Poplawski's psychiatric symptoms and his headaches substantially interfered with major life activities: he found it hard to properly care for himself at times, and had difficulty achieving regular, healthy sleep. His fixations disrupted his thinking and concentration.

**143.** The defendants had actual knowledge of the harm they were causing:

Poplawski verbally put officers on notice every chance he got; he filed countless grievances over the years seeking improvements in his conditions; he sought accommodations (e.g., socialization-based services like improved visitation, phone calls; fair access to all programs) to remedy his disintegrating sense of self.

**144.** Poplawski has exhausted his administrative remedies in terms of seeking compensation for his injuries: he filed a grievance, appealed it through all levels of review, but was ultimately denied.

### D. Joinder & Class Action Allegations

**145.** The plaintiffs assert a right to redress of violations arising from the same series of occurences.

**146.** This complaint raises questions of fact and law common to all plaintiffs, including whether the defendants' policy of housing class members in solitary confinement indefinitely and without rationale constitutes cruel and unusual punishment and violates due process rights.

**147.** The plaintiffs bring this action on behalf of all others similarly situated, pursuant to the Federal Rules of Civil Procedure 23(a).

**148.** The plaintiffs seek to represent a global class consisting of all death-condemned persons who have been held in solitary confinement by the Pa. DOC.

**149.** The plaintiffs seek to represent a subclass consisting of all *disabled* death-condemned persons who have been held in solitary confinement by the Pa. DOC.

**150.** The putative class is so numerous that joinder of all members is impracticable.

**151.** The size of the class eligible to bring claims (given the applicable two-year statute of limitations) is approximately 130-150.

**152.** The precise extent of the class is easily ascertainable by means of public records.

**153.** There are questions of law and fact common to all members of the class, including whether the defendants' policy of housing class members in solitary confinement indefinitely and without rationale constitutes cruel and unusual punishment and violates due process rights.

**154.** The claims of the named plaintiffs are typical of the class: they have been subjected to the same deprivations, imposed pursuant to a single statewide policy.

**155.** While the exact harms may differ somewhat between individuals, the *source* of harm is the defendants' unlawful actions, specified herein, committed against all class members in common.

**156.** The plaintiffs do not have interests inconsistent with those of the putative class.

**157.** Recognizing that pro se litigants may not lawfully represent a class in this circuit, the plaintiffs seek appointment of counsel.

**158.** This action is maintainable as a class action under Fed. R.C.P. 23(b)

(1) because the number of class members, and the number of separate actions already pending, creates a risk of inconsistent and varying adjudications.

**159.** This action is maintainable as a class action under Fed. R.C.P. 23(b) (3) because the questions of law and fact common to class members predominates over any questions affecting any individual members.

**160.** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**161.** At least 30 individual actions have been filed by putative class members raising similar claims against the same defendants based on identical facts.

**162.** Those actions are now dispersed throughout the three federal districts of Pennsylvania.

**163.** None of those action are far advanced; the vast majority have been initiated within the past 30 days.

**164.** This particular jurisdiction is a especially well-suited forum to concentrate this litigation because the prior action involving the same class and identical facts (*Reid v. Wetzel*, #18-CV-0176) is familiar to this Court.

**165.** The *Reid* class was managable and provided no notable difficulties.

**166.** A proper motion seeking appointment of counsel and class certification will follow.

## Causes of Action

### Count I - Cruel and Unusual Punishment
Facial and as-applied violations of U.S. Constitution, Amendment VIII

> *Lopez, Watkins, Stokes, Uderra v. Horn*
> *Lopez, Houser, Watkins, Stokes, Uderra v. Beard*
> *All plaintiffs v. Wetzel*

**167.** All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, #18-CV-0176, Doc. 1, are hereby incorporated into this cause of action.

**168.** The medical and psychiatric literature on prolonged solitary confinement is extensive and unanimous in its acknowledgement of the harms it causes. E.g., *see* Declaration of Craig Haney, M.D., #18-CV-0176, Doc. #28-6; Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. Law & Pol'y 325 (2006). *See also Glossip v. Gross*, 135 S.Ct. 2726, 2765 (2015) (Breyer, J., dissenting) (collecting sources).

**169.** The plaintiffs have been subjected to a duration of isolation that far exceeds the amounts typically reported in the literature and considered psychiatrically problematic.

**170.** The physical and psychological symptoms experienced by the plaintifffs, as described aboved, are consistent with with the kinds of harms described by the literature.

**171.** The physical and psychological consequences of long-term isolation constitute a severe deprivation of fundamental human needs, including the needs

for human interaction, environmental stimulation, sleep, and adequate exercise.

172. The conditions of the plaintiffs' confinement had a mutually reinforcing effect that, in totality, produce the deprivation of fundamental human needs.

173. This deprivation of human needs has caused continuing and irreparable damage to the plaintiffs.

174. The defendants' policy of holding the plaintiffs in solitary confinement served no penological purpose.

175. Studies show that prisoners convicted of murder are not more violent and are no more of a security risk than prisoners convicted of other crimes; their rates of "violent or assaultive infractions" have been found to be "below or near the mean for the entire inmate cohort." Sorenson & Cunningham, *Conviction Offense and Prison Violence*, 56 Crime & Delinquency 103, 114 (2010).

176. Death-sentenced prisoners are statistically less violent than prisoners who are eligible for parole. Cunningham, et al., *Is Death Row Obsolete?* 23 Behav. Sci. Law 307, 316-19 (2005); *see also* Cunningham et al., *Wasted Resources and Gratuitous Suffering: The Failure of a Security Rationale for Death Row*, 22 Psychol. Pub. Pol'y & Law 185 (2016).

177. Defendant Wetzel was well aware of the risks inherent in prolonged solitary confinement; Wetzel has admitted to being familiar with the body of literature describing the negative effects of long-term solitary confinement. *See Johnston*, 431 F.3d at 680-81.

**178.** Defendant Wetzel has been named as a defendant in numerous other lawsuits in which courts recognized the negative impact of solitary confinement. *See, e.g., Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777 (M.D. Pa. 2016); etc.

**179.** The plaintiffs consistently made the defendants aware of their ongoing injuries—over the course of decades—by means of administative grievances, written complaints, and in-person to staff members (and before the "Program Review Committee" see Count II, below).

**180.** The defendants' continued isolation of the plaintiffs was done with deliberate indifference to the known substantial risk that the plaintiffs' rights would be violated and that they would suffer serious harm.

**181.** The defendants' indifference to the plaintiffs' federally protected rights was reckless and callous.

### Count II - Substantive and Procedural Due Process
Facial and as-applied violations of U.S. Const., Amendment XIV

> *Lopez, Watkins, Stokes, & Uderra v. Horn*
> *Lopez, Houser, Watkins, Stokes, & Uderra v. Beard*
> *All plaintiffs v. Wetzel*

**182.** All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, #18-CV-0176, Doc. 1, are hereby incorporated into this cause of action.

**183.** The conditions and length of confinement constituted atypical and significant hardship as compared with the ordinary incidents of prison life.

**184.** The plaintiffs were held in solitary confinement *solely* because of their sentences—not based on any disciplinary infractions or individualized security considerations.

**185.** The plaintiffs were held in solitary confinement indefinitely without any meaningful opportunity to challenge their placement through administrative means. *See* DC-ADM 804 "Inmate Grievance System Procedures Manual" § 1(A) (7) ("Issues concerning . . . the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System.").

**186.** Every 90 days, the plaintiffs' continuing isolation was automatically reapproved to continue by a "Program Review Committee."

**187.** The plaintiffs had no meaningful opportunity to rebut or respond to the automatic continuation of their isolation.

**188.** The plaintiffs were provided with no notice of what they could do to be removed from solitary confinement.

**189.** The Program Review Committees consisted of department employees who were powerless to affect change in department-wide policies.

**190.** Only the defendants had the ability to release the plaintiffs from solitary confinement.

**191.** The defendants' conduct—subjecting the plaintiffs (indefinitely and without legitimate rationale) in depraved conditions they knew were certain to be harmful—shocks the conscience.

## Count III - Failure to Accommodate
Violations of Title II of the Americans With Disabilities Act, 42 U.S.C. § 12102 *et seq.*,
and § 504 of the Rehabilitation Act

*All plaintiffs v. Pa. DOC*

**192.** All relevant factual averments contained in this complaint, and in *Reid v. Wetzel*, #18-CV-0176, Doc. 1, are hereby incorporated into this cause of action.

**193.** Defendant DOC is a "public entity," as defined by the ADA.

**194.** Defendant DOC receives federal finanical assistance and thus is bound to comply with Section 504 of the Rehabilitation Act of 1973.

**195.** Pursuant to the RA, local and state government agencies that receive federal financial assistance must reasonably accommodate disabled individuals so that they may have access to the same benefits and services as non-disabled persons.

**196.** Plaintiffs suffer from disabilities as specified in ¶¶ 91-92, 95-96, 101, 106, 113, 120-21, 123, 128, 131, 136-38, and 141.

**197.** Plaintiffs' disabilities substantially interfere with major life activities as specified in ¶¶ 97, 105, 107, 117, 124, 132, and 142.

**198.** Defendant DOC excluded the plaintiffs from participation in, and from enjoying the benefits of, its services, programs, and activities, as specified in ¶¶ 42-53.

**199.** A prison's obligation to comply with the ADA and RA does not disap-

pear when inmates are placed in segregated housing unit, regardless of the reason they are housed there.

**200.** 28 C.F.R. § 35.152(b)(2) requires state facilities to "ensure inmates or detainees with disabilities are housed in the most integrated setting appropriate." *See also* 28 C.F.R. §35.130(d).

**201.** The DOC did not make individualized assessments of the plaintiffs to determine the nature and severity of the risks they'd pose in a less-restrictive setting.

**202.** The plaintiffs were excluded from services, programs, and activities by reason of their disability.

**203.** Unnecessary segregation of individuals with disabilities in the provision of public services is *itself* a form of discrimination.

**204.** Throughout their incarceration, the plaintiffs requested reasonable accommodations as specified in ¶¶ 98, 109, 111, 118, 125, 133, and 143 by the means described therein.

**205.** Despite their knowledge of the plaintiff's disabilities, defendants refused to make reasonable accommodations for the plaintiff's needs, including meaning-ful social interaction, sleep, exercise—and, in general, humane condit-ions of confinement.

**206.** Intentional discrimination can be inferred from the defendants' deliberate indifference to the risk that the plaintiffs' rights were substantially

likely to be violated and their failure to act upon that knowledge.

**207.** Defendant DOC failed to respond to a historical pattern of injuries occuring to prisoners subjected to identical forms of isolation. *See*, e.g., *Shoatz v. Wetzel*, 2016 U.S. Dist. LEXIS 17515 (W.D. Pa.); *A. Johnson v. Wetzel*, 209 F. Supp. 3d 766 (3d Cir. 2016); *Palakovic v. Wetzel*, 854 F.3d 209 (3c Cir. 2017); *Williams v. Wetzel*, 848 F.3d 549 (3d Cir. 2017); etc.

**208.** The relevant factual averments from Count I, and in *Reid v. Wetzel*, # 18-CV-0176, Doc. 1, are specifically referenced and incorporated to prove the defendants' deliberate indifference.

**209.** As a direct and proximate cause of the defendants' ADA and RA violations, the plaintiff suffered humiliation, trauma, emotional distress, pain and suffering.

<b>Relief Sought</b>

WHEREFORE, the plaintiffs respectfully request that this Honorable Court :

- DECLARE that the defendants' conduct—on its very face and as applied to these plaintiffs—constituted cruel and unusual punishment under the Eighth Amendment to the U.S constitution;

- DECLARE that the defendants' conduct—on its very face and as applied to these plaintiffs—offended the Fourteenth Amendment's guarantee to substantive and procedural due process;

- AWARD nominal, compensatory, and punitive monetary damages;

- APPOINT counsel;

- CERTIFY the plaintiff class under Fed.R.C.P. 23(b)(3), or, alternatively, under 23(b)(1);

- AWARD costs, fees, and expenses; and

- GRANT any other relief deemed proper and Just.

We plaintiffs submit this complaint respectfully,
and we individually verify its truthfulness,
subject to the penalties of 28 U.S.C. § 1746,

**George Lopez**, #CZ3498

**Darien Houser**, #GC7509

**Gerald Watkins**, #DD5212

**Ralph Stokes**, #AY9034

**Jose Uderra**, #CC3832

**Richard Poplawski**, # KB7354

**All resident at:**
State Correctional Institution Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

**Date:**

October 21st,
2021

31

TO: RONALD REAGAN  FEDERAL BULDING
U.S. DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
228 WALNUT STREET 17101-1714
P.O. BOX 1148
HARRIABURG, PA. 17108-1754

**FILED**
HARRISBURG, PA

OCT 2 5 2021

PER_____
DEPUTY CLERK

FROM: GEORGE IVAN LOPEZ, CZ-3198
10/21/2021
SCI-PHOENIX
1200 MOKYCHIC DRIVE
COLLEGEVILLE, PA. 19426


DEAR CLERK OF COURT,

   Please be advised that attached hereto, you will find our Civil Complaint (Original) and attached supporting exhibits.

   Also, can you please provide me with the Case number so to forward filing fee to this Court immediately.

        THANK YOU KINDLY FOR YOUR TIME AND YOUR PROMPT ATTENTION

SINCERELY

GEORGE IVAN LOPEZ, CZ-3198



**PRIORITY**®
**MAIL**

FROM: George Ivan Lopez
ID# CZ-3198
1200 Mokychic Drive
Collegeville, PA. 19426

stic use.

0 of insurance (restrictions apply).*

l many international destinations.

aration form is required.

arding claims exclusions see the

or availability and limitations of coverage.

*NITED STATES*
*OSTAL SERVICE*® NEOPOST™

**USPS TRACKING #**



8178 9820 3207 3109 67

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

2020
x 9 1/2

**TO:**

Clerk of the Court
United States District Court
Ronald Reagan Federal Bldg.
228 Walnut Street
P. O. Box 983
Harrisburg, PA 17108-0983

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.