IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEORGE IVAN LOPEZ, et al., | : | Honorable Christopher C. Connor |
| | : | Honorable MJ Karoline Mehalchick |
| Plaintiff | : | |
| | : | |
| v. | : | No. 3:21-CV-1819 |
| | : | |
| JOHN WETZEL, et al., | : | |
| | : | |
| Defendants | : | Filed Via Electronic Case Filing |

BRIEF IN SUPPORT OF THE DEFENDANTS'
PARTIAL MOTION TO DISMISS THE COMPLAINT

Procedural History

Plaintiffs, individuals presently sentenced to death and incarcerated by the Commonwealth of Pennsylvania, Department of Corrections at the State Correctional Institution at Phoenix ("SCI-Phoenix") filed a complaint pursuant to 42 U.S.C. § 1983 on October 26, 2021[1]. See Doc. 1. Named as Defendants are former-Secretaries of Corrections John Wetzel, Jeffery Beard, Martin Horn and the Pennsylvania Department of Corrections. Id. On February 15, 2022, the undersigned counsel entered her appearance[2] on behalf of Defendants. See Doc. 31. Based on the date of the waiver, Defendants' response to the complaint is due by February 19, 2022. Id.

Statement of Alleged Facts

---

[1] As part of their Complaint, Plaintiffs seek class certification pursuant to Fed.R.C.P 23(b)(3) or, alternatively 23(b)1). As of the date of the filing of this brief, Plaintiffs have not filed a motion seeking appointment of counsel and class certification. Once a motion is filed, Defendants will file a response.
[2] Service was previously waived on behalf of Defendants on January 20, 2022. See Doc. 30.

Plaintiffs have all alleged they were held in solitary confinement under harsh conditions that include a small cell, constant illumination, lack of social interaction, lack of visitation, lack of educational services, lack of organized recreational activities, etc. See Doc. 1 at ¶¶22-64. All of the Plaintiffs contend they suffer from a variety of medical and mental health disorders. Id. at ¶¶ 90-144. Plaintiffs each aver that as a result of their medical and mental disorders in combination with the harsh conditions caused them to experience significant physical pain and exasperated medical and mental issues. Id.

Plaintiffs contend that the harsh conditions endured in solitary confinement lasted until December 3, 2019, when the Department implemented a new policy that repositioned the environment of the CCU ("Capital Case Unit"). Id at ¶ 65.

Plaintiffs make three discrete claims based upon their long-term confinement in the "CCU". First, Plaintiffs allege that their prolonged solitary confinement violated the Eighth Amendment prohibition against cruel and unusual punishment. Id. at ¶¶ 167-181. Second, Plaintiffs contend that their prolonged solitary confinement violated the Fourteenth Amendment. Id. at ¶¶ 182-191. Finally, Plaintiffs contend their prolonged solitary confinement violated the American with Disabilities Act ("ADA") and the Rehabilitation Act. Id. at ¶¶ 192-209.

Of note, however, is the fact that the conditions of confinement of which Plaintiffs complain were materially altered beginning in the spring of 2018 as part of the Department's response to a class action filed on behalf of death-sentenced

prisoners. Contrary to Plaintiffs' allegations that the conditions in the CCU improved only when the unit policy was made effective on December 3, 2019, the conditions in the CCU underwent significant improvement beginning in April of 2018.

The policy referenced by Plaintiffs, 7.5.1., Section 2, was officially issued on December 3, 2019, and made effective on December 10, 2019. <u>See</u> Department Policy 7.5.1., Section 2, attached as Exhibit A.[3] This policy significantly expanded capital prisoners' access to congregate activities, out of cell opportunities, contact visitation and services. Though the policy was technically effective on December 10, 2019, it was nonetheless undergoing implementation starting in the spring of 2018 through various interim policies and plans of action.

<u>Statement of Questions Presented</u>[4]

1.    Should Plaintiffs' claim of a violation of their Eighth Amendment rights be dismissed with prejudice because Defendants were granted qualified immunity as to that issue by the Third Circuit Court of Appeals?

2.    Should Plaintiffs' claim of a violation of their Fourteenth Amendment rights of due process be dismissed with prejudice because Defendants were granted qualified immunity as to that issue by the Third Circuit Court of Appeals?

3.    Should Plaintiffs' claim of a violation of the Americans with Disabilities Act against Defendants Wetzel, Beard and Horn be dismissed because the Act does not provide for a private cause of action against an individual defendant?

---

[3] A court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. <u>*See Cortec Indus., Inc. v. Sum Holding, L.P.,*</u> 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

[4] All questions presented are respectfully requested to be answered in the affirmative.

<u>Standard of Review</u>

In accordance with Fed.R.Civ.P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." "A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." <u>I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist</u>., 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677-78 (2009). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007). Detailed factual allegations are not required, but more is required than labels, conclusions, and a formulaic recitation of the elements of a cause of action. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211 (3d Cir. 2009). "A complaint has to "show" such an entitlement with its facts." <u>Id</u>.

In considering whether a complaint fails to state a claim upon which relief can be granted, the court must accept as true all well-pleaded factual allegations in the complaint, and all reasonable inferences that can be drawn from the complaint must be construed in the light most favorable to the plaintiff. <u>Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.</u>, 20 F.3d 1250, 1261 (3d Cir. 1994). But a court

"need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a...plaintiff can prove facts that the...plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983).

Argument

1.    Plaintiffs' claim of a violation of their Eighth Amendment rights should be dismissed with prejudice because Defendants were granted qualified immunity as to that issue by the Third Circuit Court of Appeals.

Plaintiffs contend that their confinement in the CCU, and the previous conditions associated with that type of housing, violated the Eighth Amendment prohibition against cruel and unusual punishment. See Doc. 1, ¶¶ 167-181 "When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with 'deliberate indifference' to the inmate's health. Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The objective inquiry is whether the inmate was 'denied the minimal civilized measure of life's necessities.' Hudson, 503 U.S. at 9, 112 S.Ct. 995." Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000). In this setting, it is clear that:

> The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they

> "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

Atkinson v. Taylor, 316 F.3d 257, 272 (3d Cir. 2003).

Thus, these claims also require proof of both a culpable state of mind and objective proof of physical conditions of confinement that shock the conscience and depart from minimal civilized standards of life's necessities. At the same time, it is also clear that "the Constitution 'does not mandate comfortable prisons.'" Farmer v. Brennan, 511 U.S. 825, 833 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Instead, to establish an Eighth Amendment claim, a plaintiff must show that he has been deprived of "the minimal civilized measure of life's necessities." Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997) (quoting Young v. Quinlan, 960 F.2d 351, 361 (3d Cir. 1991)). This includes showing that the conditions of confinement pose "a substantial risk of serious harm" to an inmate's health or safety. Farmer, 511 U.S. at 834. In considering such claims, courts emphasize the duration of the complainant's exposure to the allegedly unconstitutional conditions and the "totality of the circumstances" as critical to a finding of cruel and inhumane treatment. Rhodes, 452 U.S. at 362-63.

Plaintiffs' allegations of an Eighth Amendment violation are unavailing because the Third Circuit Court of Appeals has examined identical claims and determined that the Department of Corrections and Department officials are entitled to qualified immunity as to such claims. "Qualified immunity shields government officials from civil damages liability unless the official violated a

statutory or constitutional right that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012). A qualified immunity analysis involves two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly established at the time of the challenged conduct. <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731,735 (2011). Lower courts have the discretion to decide which question to analyze first. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). The Supreme Court has cautioned courts to "think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." <u>Id</u>. (internal quotations omitted); <u>see also al-Kidd</u>, 563 U.S. at 735.

An official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" <u>al-Kidd</u>, 563 U.S. at 741 (<u>quoting Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). The Supreme Court has stated that this standard does not require a case directly on point, but requires that "existing precedent must have placed the statutory or constitutional question beyond debate." <u>al-Kidd</u>, 563 U.S. at 741. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." <u>Id</u>. at 743 (<u>quoting Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)); <u>see also Taylor v. Barkes</u>, 135 S. Ct. 2042, 2044 (2015).

The dispositive question that the court must ask is "whether the violative nature of *particular* conduct is clearly established." <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (<u>quoting al-Kidd</u>, 563 U.S. at 742). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Id.</u>; <u>see also Davenport v. Borough of Homestead</u>, 870 F.3d 273, 281 (3d Cir. 2017). This "clearly established" standard ensures that an official can reasonably anticipate when his or her conduct may give rise to liability, and "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties." <u>Reichle</u>, 566 U.S. at 664.

The Supreme Court has emphasized the importance of the qualified immunity defense for public officials, including the requirement that a plaintiff present authority clearly establishing the right at issue. <u>See Kisela v. Hughes</u>, 138 S.Ct. 1148, 1152-53 (2018); <u>District of Columbia v. Wesby</u>, 138 S.Ct. 577, 589-91 (2018). Both the Supreme Court and this Court have emphasized the importance of the clearly established authority requirement in the context of claims addressing the administration of prisons. <u>See Taylor v. Barkes</u>, 135 S.Ct. 2042, 2044-45 (2015) (no authority clearly established "a right to the proper implementation of adequate suicide prevention protocols" in a prison); <u>Michtavi v. Scism</u>, 808 F.3d 203, 207 (3d Cir. 2015) (applying <u>Taylor</u> and finding no clearly established authority holding that prison officials must treat certain medical conditions).

Defendants were previously granted qualified immunity as to any Eighth Amendment claims arising out of the conditions of confinement in the CCU. In

8

Porter v. Pennsylvania Department of Corrections, et al., 974 F.3d 431 (3d Cir. 2020), the Third Circuit Court of Appeals examined a prisoner's claim that his continued confinement in the CCU following his receipt of sentencing relief violated his rights under the Eighth and Fourteenth Amendments. The Third Circuit examined allegations of conditions identical to the ones averred by Plaintiff, including: the size of the Appellant's cell, the lack of out of cell opportunities, weekday exercise opportunities in small cubicles, non-contact visitation privileges, limited telephone access, access to mental health services through his cell door, strip searches, limited job assignments, lack of educational opportunities and religious services, etc. Id., 974 F.3d at 436.

The Third Circuit ultimately determined that Appellant had received the type of sentencing relief that should have caused him to be removed from the CCU pending resentencing. However, the Third Circuit also determined that Defendants were entitled to qualified immunity from claims for an Eighth Amendment violation arising out of an individual's confinement in the CCU. Id at 450. (Holding that Porter's Eighth Amendment rights had not been clearly established, and that Defendants were entitled to qualified immunity on that claim.).

Plaintiffs' claim alleging violations of the Eighth Amendment due to the conditions of confinement in the CCU should be dismissed, because Defendants are entitled to qualified immunity on such a claim as determined by the Third Circuit Court of appeals. Moreover, by the time Porter had been decided and the

opinion issued on September 1, 2020, the Defendants had already made significant improvements to the CCU, such that the conditions of confinement in that unit could no longer be seriously challenged as restrictive or solitary confinement. There was thus no period for which Plaintiffs were housed in the CCU where the Defendants were either not entitled to qualified immunity for the conditions of their confinement, or when the conditions had improved to such a degree that no Eighth Amendment claim could have survived.

2.    Plaintiffs' claim of a violation of their Fourteenth Amendment rights of due process should be dismissed with prejudice because Defendants were granted qualified immunity as to that issue by the Third Circuit Court of Appeals.

Plaintiffs contend that their confinement in the CCU, and the lack of any process or mechanism to obtain a release or transfer from that unit, violates the Due Process Clause of the Fourteenth Amendment. See Doc. 1, ¶¶ 185-190. The Due Process Clause prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To invoke the Due Process Clause, a plaintiff must show a protected liberty interest and that the procedural safeguards were inadequate. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000). A plaintiff must establish both elements—the existence of adequate process defeats a due process claim even where there is a protected interest at stake. Wilkinson v. Austin, 545 U.S. 209, 221 (2005).

For an inmate to have a liberty interest, "the right alleged must confer 'freedom from restraint which . . . imposes atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life." <u>Williams</u>, 848 F.3d at 559 (quoting <u>Sandin v. Conner</u>, 515 U.S. 472 (1995)) (citation omitted and emphasis in original). To determine if a condition places an atypical and significant hardship on the inmate, the Third Circuit uses a "two-factor inquiry: (1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." <u>Id</u>. at 560 (citing <u>Shoats</u>, 213 F.3d at 144). The Supreme Court has expressly declined to articulate what baseline should be used "to measure what is atypical and significant in any particular prison system." <u>Wilkinson</u>, 545 U.S. at 223.

Defendants were previously granted qualified immunity as to any Fourteenth Amendment claims addressing automatic confinement to or failure to release from the CCU for prisoners who have not received sentencing relief. In <u>Williams v. Secretary Pennsylvania Department of Corrections</u>, 848 F.3d 549 (3d Cir. 2017), the Third Circuit Court of Appeals examined claims by two previously death-sentenced prisoners that alleged their continued confinement in the CCU after receiving sentencing relief violated their rights under the Fourteenth Amendment.

Ultimately, the Third Circuit concluded that the Appellants should have received due process to determine the most appropriate housing situation. However, the Third Circuit also determined that the Department was entitled to qualified immunity as to any Fourteenth Amendment claims arising out of continued confinement in the CCU, limited only by whether a potential plaintiff

had received some sentencing relief that would require them to be removed from the CCU. <u>Williams</u>, 848 F.3d at 576 ("[W]e will affirm the district courts' orders granting summary judgment in favor of Defendants based on qualified immunity.").

As a result of the <u>Williams</u> decision, capital prisoners who receive some form of sentencing relief are removed from the CCU pending the re-sentencing process. If Plaintiffs had received any sentencing relief in the form of a successful PCRA or habeas action they would have received due process in the form of a review of their current sentence posture and removal from the CCU pending re-sentencing. However, Plaintiffs have received no such relief. Their claim of a violation of their due process rights under the Fourteenth Amendment is only that they are not provided with regular reviews to support their continued confinement in the CCU. But that is not what <u>Williams</u> requires for prisoners who maintain active death-sentences with no pending sentencing or conviction relief. Moreover, <u>Williams</u>, by its explicit language, has granted Defendants qualified immunity as to Fourteenth Amendment due process claims arising out of continued confinement in the CCU. <u>Id</u>. at 569 (Confinement on death row was not a significant or atypical hardship for prisoners whose death sentences had not been vacated. The liberty interest of the <u>Williams</u> plaintiffs are "not comparable to those of inmates with active death sentences that arguably require continued placement on death row.").

3.    Plaintiffs' claim of a violation of the Americans with Disabilities Act against Defendants Wetzel, Beard, and Horn should be dismissed because the Act

does not provide for a private cause of action against an individual defendant.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As prisons fall within the definition of "public entity," prisoners may bring claims against their jailors for disability discrimination under Title II of the ADA. Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209–210 (1998); see also 42 U.S.C. § 12313(1). "[T]he phrase 'service, program, or activity' under Title II...is 'extremely broad in scope and includes anything a public entity does.'" Furgess v. Pa. Dept. of Corr., 933 F.3d 285, 289 (3d Cir. 2019). As such, "a prison's refusal to accommodate inmates' disabilities in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitute a denial of the benefits of a prison's services, programs, or activities under Title II" of the ADA. Furgess, 933 F.3d at 290 (internal quotation and citation omitted).

To state a cognizable claim under Title II of the ADA, a plaintiff must show that: "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." Mutschler v. SCI Albion CHCA Health Care, 445 F. App'x 617, 621 (3d Cir. 2011). "[T]he statute of limitations applicable to claims

under Title II of the ADA ...is the statute of limitations for personal injury actions in the state in which the trial court sits." <u>Disabled in Action v. SEPTA</u>, 539 F.3d 199, 208 (3d Cir. 2008); <u>Hall v. Minner</u>, 411 Fed.Appx. 443, 445 (3d Cir. 2011). In Pennsylvania the statute of limitations for a personal injury action is two years. <u>See</u> 42 Pa.C.S. § 5524.

To the extent Plaintiffs seek to advance a claim based upon the ADA against Defendants Wetzel, Beard and Horn, their claim must fail. Although the United States Court of Appeals for the Third Circuit has not addressed the issue precedentially, it has indicated in several non-precedential decisions that Title II of the ADA does not recognize claims for monetary damages against government officers in their individual capacities. <u>See Kokinda v. Pa. Dep't of Corr</u>., 779 F. App'x. 938, 942 (3d Cir. 2019) (per curiam) (holding that plaintiff's "claims for individual damages liability under Title II of the ADA fail for the simple reason that there is no such liability." (internal citations omitted)); <u>Bowens v. Wetzel</u>, 674 F. App'x 113, 136 (3d Cir. 2017) (noting that "the District Court could have properly followed the holdings of [other] circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim." (citations omitted)); <u>Matthews v. Pa. Dep't of Corr</u>., 613 F. App'x 163, 169-70 (3d Cir. 2015) (agreeing with the Second and Eighth Circuits that "Title II of the ADA does not provide for suits against state officers in their individual capacities")

14

Accordingly, Plaintiffs claim pursuant to the ADA against Defendants Wetzel, Beard, and Horn should be dismissed with prejudice.

## Conclusion

Defendants respectfully request that this Court grant their motion and dismiss Plaintiff's claims under the Eighth and Fourteenth Amendments with prejudice.

Respectfully submitted,

Office of General Counsel

___/s/ Kim Adams_____
Kim Adams, Assistant Counsel
Attorney ID No.: 205848
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
Phone No.: (717) 728-7763
Fax No.: (717) 728-0307
E-mail: kimbadams@pa.gov

Date: February 18, 2022

EXHIBIT A



| | |
|---|---|
| PROCEDURES MANUAL |
| Commonwealth of Pennsylvania • Department of Corrections |

| Policy Subject: | Policy Number: |
|---|---|
| **Administration of Specialized Inmate Housing** | **7.5.1** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **December 3, 2019** | **Signature on File** <br> **John E. Wetzel** | **December 10, 2019** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

EXHIBIT A

## Section 2 – Capital Case Unit (CCU) Phase I Inmates

A. Housing ........................................................................................................... 2-1
B. Inmate Custody Status ...................................................................................... 2-1
C. General Security Procedures............................................................................. 2-1
D. Work Assignments ............................................................................................ 2-2
E. Visiting............................................................................................................... 2-2
F. Telephone Privileges ........................................................................................ 2-3
G. Tablets, Television, Radio, and Outside Vendor Purchases............................. 2-3
H. Exercise and Activity ........................................................................................ 2-3
I. Personal Property/Commissary and Outside Purchases/Cell Content ............. 2-4
J. Facility Programming ........................................................................................ 2-5
K. Religious Activities............................................................................................ 2-5
L. Access to Legal Materials................................................................................. 2-6
M. Access to Reading Materials ............................................................................ 2-7
N. Transfer of Phase I Inmates ............................................................................. 2-7
O. Placement in Disciplinary Custody (DC) or Administrative Custody (AC) Status............. 2-8
P. Psychiatric Treatment of a Capital Case Inmate.............................................. 2-8
Q. News Media....................................................................................................... 2-10
R. Modification of Sentence and Transfer to Standard General Population ....................... 2-11
S. Conversion to Phase II ..................................................................................... 2-11

Case 3:24-cv-00605-KM    Document 33    Filed 02/18/22    Page 18 of 28

EXHIBIT A

*7.5.1, Administration of Specialized Inmate Housing Procedures Manual*
*Section 2 – Capital Case Unit (CCU) Phase I Inmates*

**Section 2 – Capital Case Unit (CCU) Phase I Inmates**

**A. Housing**

1. A male Capital Case inmate shall be housed at the State Correctional Institution (SCI) at Phoenix or Greene. Exceptions must be approved by the Secretary/designee.

2. A female Capital Case inmate shall be housed at SCI Muncy.

3. If a Capital Case inmate is to be housed at a facility other than a Capital Case facility, a copy of this manual shall be provided to that facility.

**B. Inmate Custody Status**

1. A Capital Case inmate in Phase I shall be housed in Capital Case (CC) status unless he/she is placed in Disciplinary Custody (DC) or Administrative Custody (AC) status in accordance with Department policy **DC-ADM 801, "Inmate Discipline" or DC-ADM 802, "Administrative Custody Procedures."**

2. A registered nurse or licensed psychologist, depending upon the time of intake, shall assess the Capital Case inmate, upon being processed into his/her designated housing unit, using the **DC-510, Medical Health Care Screening** and **DC-510A, Restrictive Housing – Health Care Screening** in accordance with Department policy **13.8.1, "Access to Mental Health Care," Section 1, Psychological Services**.

3. The Medical/Psychology Department shall determine whether the inmate requires an **Individual Treatment Plan (ITP)** or another form(s) of therapy or intervention.

4. A copy of the **DC-510** and **DC-510A** shall be placed in the inmate's **DC-14, Counselor's File** and in the psychiatric section of the medical record.

**C. General Security Procedures**

The Capital Case Unit (CCU) shall operate as a specialized general population housing unit that will house only inmates with CC status. The unit shall not be operated as a Security Level 5 Housing Unit and will not operate under Department policy **6.5.1, "Administration of Security Level 5 Housing Units."**

1. Because the CCU shall operate as a general population housing unit rather than a Security Level 5 unit, inmates confined there shall not be required to wear uniforms designating them as Security Level 5 inmates.

2. Inmates confined in the CCU shall not be required to change cells every 90 days unless an individualized determination has been made that the inmate is an escape risk, consistent with Department policy **6.5.1, Section 13** regarding escape risks.

Issued: 12/3/2019
Effective: 12/10/2019

EXHIBIT A

3. Cells in the CCU shall also not be constantly illuminated during nighttime hours, though staff conducting nighttime rounds can utilize lighting implements to perform the required cell checks.

4. Inmates confined in the CCU shall not be subject to strip-searching, wrist restraints, or leg restraints, tethering or other physical restraints when exiting their cells or moving about the unit unless such security measures are required by officers responding to an urgent situation or as part of efforts to restore order during a security disturbance. Additionally, a particular inmate can be subjected to the aforementioned security restraints if an individualized determination made by the Facility Manager has concluded that the inmate represents a unique security risk.

5. Inmates confined in the CCU shall not be subject to strip-searching, wrist restraints, or leg restraints, tethering or other physical restraints when traveling outside the CCU unless an individualized determination has been made by the Facility Manager that a unique security concern necessitates those measures, or such measures are the standard procedure for all inmates in the applicable circumstances (e.g., search of inmate following contact visit or before traveling to outside hospital, etc.). CCU inmates may be escorted when traveling outside the CCU if such escorts would be employed for other general population inmates traveling through that particular area or if other security needs dictate the use of such escorts.

All individualized determinations made by the Facility Manager that additional security measures are required to be imposed upon a particular inmate, including the security restraints listed above, shall be reconsidered every three months and the reasons for extension shall be documented.

**D. Work Assignments**

An inmate in Phase I is permitted a work assignment as follows:

1. within the housing unit approved by the Unit Management Team and as defined in Department policy **DC-ADM 816, "Inmate Compensation;"** or

2. in the areas outside but adjacent to the unit (e.g., grounds keeping, snow removal, grass mowing, nearby kitchen facilities, etc.). Such an assignment requires the approval of the Facility Manager/designee.

**E. Visiting**

1. Visits shall be provided as otherwise permitted to general population inmates, including contact visits with attorneys of record, spiritual advisors and other visitors, however, visits may be restricted to non-contact only or entirely if, based upon an individualized determination by the Facility Manager that visits for a particular CCU inmate presents a serious security threat or a background check reveals that a particular visitor should not be permitted to participate in such visits. Non-contact visiting orders shall be

reconsidered by the Facility Manager every three months. Reasons for continuing the order beyond the three month period shall be documented in writing.

2. A capital case inmate housed in a capital case housing unit will be permitted to have visits in accordance with the visiting hours established by the facility. Visiting may be permitted every day of the year unless suspended by the Facility Manager.

3. A capital case inmate shall be provided with visits of at least one hour in duration and shall occur during regularly scheduled visiting hours. Longer periods may be allowed depending upon the available space.

4. Legal and spiritual advisor visits shall be permitted in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

5. Attorney/client confidentiality privileges are to be maintained and each inmate must be given the opportunity to have confidential conversations with the Attorney of Record, including the Attorney's staff, paralegals, investigators, etc.

6. The Facility Manager/designee may approve additional and/or extended visits in accordance with Department policy **DC-ADM 812.**

## F. Telephone Privileges

Each inmate shall be permitted to use the inmate telephone system on a daily basis for no less than 15 minutes per usage, and otherwise in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."** The number of authorized calls will be in accordance with the facility regulations related to telephone usage.

## G. Tablets, Television, Radio, and Outside Vendor Purchases

Tablets, personal televisions, radio/tape/compact disk players, and all other approved items available to inmates in standard general population from approved outside vendors are permitted for Phase I inmates. The purchase of these items shall be in accordance with Department policy **DC-ADM 815, "Personal Property, State Issued Items, and Commissary/Outside Purchases."**

## H. Exercise and Activity

A Phase I inmate shall be offered at least 42.5 out-of-cell (OOC) hours for activities and exercise per week. At least four hours of OOC activities/exercise shall be offered per day, seven days a week. OOC activities and exercise are to be offered during normal waking hours (7:00am to 9:00pm).

1. OOC offerings shall be scheduled during evenings and on weekends to achieve the minimum required weekly offering.

2. OOC offerings will maximize congregate socialization opportunities.

3. OOC offerings shall be logged and recorded on a tracking form for each inmate.

4. OOC offerings may include:

   a. yard/outdoor exercise;

   b. block-out time/indoor recreation;

   c. law library;

   d. congregate meals;

   e. treatment or counseling team meetings, to include meetings with counselors, psychology, mental health or medical treatment staff, etc;

   f. meetings with religious service staff, including congregate religious worship on the unit during dayroom periods or, if space and time permit, during separate, dedicated times;

   g. work assignments; and/or

   h. organized educational, treatment, or recreational programs or activities.

5. The required weekly offering of OOC time shall not include activities such as showers, medical appointments, attorney meetings, classification or disciplinary hearings, or court appearances.

6. All inmates in the CCU will be offered two hours of outdoor exercise per day weather permitting. Inmates will have access to water during outdoor yard time. Either the facility will permit inmates to take water to the yard or the facility will provide water.

7. Indoor block time will be offered when weather does not permit outdoor exercise.

8. All inmates in the CCU will be permitted to shower and shave daily.

**I. Personal Property/Commissary and Outside Purchases/Cell Content**

State-issued clothing, personal property allowances, handling of property, commissary orders, outside purchases, and gift pack program for CCU inmates in accordance with Department policy **DC-ADM 815** for general population inmates. Extra storage boxes for legal materials for active cases may also be requested in accordance with Department policy **DC-ADM 815**.

Issued: 12/3/2019
Effective: 12/10/2019

Case 3:24-cv-00605-KM    Document 33    Filed 02/18/22    Page 22 of 28

EXHIBIT A

*7.5.1, Administration of Specialized Inmate Housing Procedures Manual*
*Section 2 – Capital Case Unit (CCU) Phase I Inmates*

## J. Facility Programming

Inmates confined in a CCU shall have access to on-unit educational programming. Such programming shall include both OOC and in-cell options for Adult Basic Education (ABE), General Equivalency Diploma (GED) courses, and individual or self-study programs.

1. Educational Programming

   The Corrections School Principal shall ensure that:

   a. all Phase I inmates are made aware of available educational opportunities, and the procedures for requesting participation;

   b. educational materials are available and are provided as needed. The Principal shall also ensure that tutoring is provided as needed and tutors shall be admitted to the CCU to perform tutoring work with CCU inmates;

   c. only materials deemed appropriate for each level are used;

   d. available educational programs include:

      (1) ABE;

      (2) GED; and

      (3) individual/self-study programs.

   e. the programs will be at no cost to the inmate; and

   f. post-secondary opportunities may be made available at the inmate's expense.

2. On-Unit Leisure Activities

   The Activities Manager shall ensure that:

   a. Phase I inmates are made aware of recreational opportunities and procedures for requesting participation; and

   b. only selected and approved arts and crafts materials, authorized by the Facility Manager/designee, are used.

## K. Religious Activities

Religious activities shall be permitted in accordance with this policy and Department policy **DC-ADM 819, "Religious Activities,"** with the following exceptions:

1. a CCU inmate may not participate in activities that occur outside of the CCU;

Case 3:24-cv-00605-KM    Document 33    Filed 02/18/22    Page 23 of 28

EXHIBIT A

*7.5.1, Administration of Specialized Inmate Housing Procedures Manual*
*Section 2 – Capital Case Unit (CCU) Phase I Inmates*

2. CCU inmates may participate in congregate religious worship. On a weekly basis, a representative of each faith group, if available, will visit the CCU for the purpose of providing a congregate religious activity or worship opportunity. Permitted religious worship will occur during existing dayroom or "block out" periods or during a separate dedicated time if time and space permits;

3. an inmate may request religious audiotapes on a weekly basis; and

4. an inmate may not retain more than two religious audiotapes at any one time.

**L. Access to Legal Materials**

1. Each housing unit in which Capital Case inmates are housed shall contain a designated area to contain a mini law library in accordance with Department policy **DC-ADM 007, "Access to Provided Legal Services."**

2. Each mini law library shall provide adequate lighting, seating for no fewer than two people, desk space adequate for a work area, and shelving that is secure.

3. A Capital Case inmate shall be given written instructions containing a current list of materials available in the mini law library, the procedures to request use of the mini law library, and the hours the mini law library is available to be used. Each capital facility shall also ensure that a typewriter, computer, or word processor is kept in the mini law library for the Capital Case inmate to use. An associated printer must be included with a word processor or computer. Any attached printer shall not be located in the personal office of any staff member.

4. The mini law library shall be made available to Capital Case inmates during daily OOC time for a minimum of six hours per day, seven days a week.

5. The Officer-in-Charge of the housing unit shall schedule use of the mini law library.

6. A Capital Case inmate may request two hour blocks of time to work in the mini law library. If no one is scheduled to use the mini law library after the two hour block of time, the inmate shall be permitted to continue using the mini law library until such time as another inmate is scheduled to use the mini law library.

7. Two or more Phase I inmates may work together in the mini law library, provided that they agree to work together and that there is no security concern or facility space limitations.

8. A Capital Case inmate may request to be put on an "on call" list to use the mini law library if no one is scheduled to use it during the period the housing unit is "open."

9. A logbook shall be maintained recording inmate use of the mini law library including each inmate's name and number, date of use, length of time used, and whether the inmate worked with another inmate.

Issued: 12/3/2019
Effective: 12/10/2019

10. At least once a week, or more often if necessary, the facility law librarian/designee shall deliver requested legal materials from the facility's general population law library and pick up requests for legal materials from the CCU.

11. The facility Librarian shall be responsible for conducting an inventory of the mini law library to ensure that all legal materials required by policy to be maintained in the CCU law library are available. If any materials are destroyed or go missing, the Librarian shall be immediately notified by unit staff, or alternatively can be notified by a **DC-135, Inmate Request to Staff Member form**, and will initiate the replacement process. A record of the inventory shall be maintained.

12. If an inmate does not have representation by an attorney and is illiterate or non-English speaking, he/she may be permitted to exchange legal information with the approval of the Facility Manager/designee, with another Capital Case inmate. Inmates assisting one another with legal work shall be permitted to exchange legal materials directly, and custody staff are not to pass legal materials from one inmate to another.

13. A search of the materials in the inmate's possession shall be conducted upon exiting the mini law library to ensure that no pages were torn from the books in an attempt to remove them from the library.

14. A Capital Case inmate shall be permitted to exchange legal materials from his/her cell with legal materials being held in storage once every 30 days. The Unit Management Team may authorize more frequent exchanges based upon demonstrated need.

## M. Access to Reading Materials

1. Library materials shall be made available through established local procedures, provided that inmates confined in the CCU shall have access to the same non-legal reading materials as the inmates in the standard general population units.

2. A Capital Case inmate shall be allowed to retain non-legal reading materials in accordance with the same policies governing retention of non-legal reading materials for the standard general population units.

3. Newspapers shall be permitted on a one-for-one exchange basis.

## N. Transfer of Phase I Inmates

If a Phase I Capital Case inmate participating in a facility program is transferred, progress records and the materials being used shall be transferred with the inmate to ensure continuity or participation at the next facility.

Issued: 12/3/2019
Effective: 12/10/2019

## O. Placement in Disciplinary Custody (DC) or Administrative Custody (AC) Status

1.  Inmates confined in the CCU shall be subject to the same disciplinary rules and procedures as inmates housed in standard general population units in accordance with Department policy **DC-ADM 801**.

2.  A CCU inmate who is seriously mentally ill (SMI) shall be subject to the same disciplinary rules and procedures as other SMI inmates housed in the standard general population, including a required contact with psychology staff after issuance of the misconduct and diversion to the Diversionary Treatment Unit, if necessary.

3.  When a Phase I Capital Case inmate is transferred to AC or DC status, the inmate will be suspended from program participation and transferred into a Restricted Housing Unit (RHU) or other appropriate housing unit in accordance with Department policy **DC-ADM 801** or **DC-ADM 802.** After the expiration of the sanction term, inmate shall be returned to the CCU.

## P. Psychiatric Treatment of a Capital Case Inmate

Psychiatric care of inmates confined in the CCU shall be rendered in accordance with Department policy **13.8.1, "Access to Mental Health Care,"** the frequency and acuity of which shall be determined by the inmate's roster status.

1.  Inmates in CCU exhibiting signs of decompensation

    a.  Anytime a staff member observes a Capital Case inmate showing signs of mental decompensation to the point where the inmate might pose a risk to him/herself or others, the observing staff shall immediately:

        (1)  notify the Facility Manager/designee, the Deputy Superintendent for Facilities Management (DSFM), and the Medical and Psychology Departments to arrange for the inmate to be evaluated for emergency mental health treatment and a suicide indicator checklist screening; and

        (2)  the Medical or Psychology staff shall assess the inmate with the **DC-510** and **DC-510A**. The staff member conducting the **DC-510** and **DC-510A** shall assist the Medical/Psychiatric Departments in evaluating the inmate.

    b.  After the facility's Medical/Psychiatric Department has evaluated the inmate, the Medical/Psychiatric Department shall consult with the Chief of Psychiatry/Medical Director at the Bureau of Health Care Services (BHCS), Central Office. An ITP shall be prepared, if indicated. Inmates confined in the CCU shall have access to all Department of Corrections (DOC) health and health care units (including those at other DOC facilities), if their treatment needs require such housing.

2-8

EXHIBIT A

    c. Any restrictions of state issued or personal property, and/or the need for staff observation of the inmate shall be in accordance with the inmate's ITP or by psychiatric orders.

2. Transfer of CCU inmate to a Mental Health Unit (MHU) or Forensic Treatment Center (FTC)

    a. If it is determined that the Capital Case inmate should be transferred to an MHU or FTC, the facility's Medical/Psychiatric Department shall coordinate the transfer of the inmate to the treatment center with the following people:

        (1) Office of the Secretary/designee;

        (2) BHCS Chief of Psychiatry/Medical Director;

        (3) Central Office Deputy of Facility Security and Special Operations;

        (4) Bureau of Treatment Services (BTS);

        (5) Office of Population Management; and

        (6) Office of Chief Counsel.

    b. The Office of Chief Counsel shall notify the following people that the Capital Case inmate is going to be moved to an MHU or FTC:

        (1) Governor's Office; and

        (2) General Counsel's Office.

    c. The MHU and/or the FTC staff shall work in conjunction with the facility's Security Office and the Central Office Deputy of Facility Security and Special Operations to ensure that proper and adequate security measures are in place to allow the inmate to fully participate in his/her individual or group treatment.

    d. When the MHU or FTC staff determine that the Capital Case inmate is stable and ready to be released, the staff shall contact the individuals listed below to arrange the return of the Capital Case inmate to his/her home facility:

        (1) Office of the Secretary/designee;

        (2) BHCS Chief of Psychiatry/Medical Director;

        (3) Central Office Deputy of Facility Security and Special Operations;

        (4) Chief Counsel's Office; and

Case 3:24-cv-00605-KM    Document 33    Filed 02/18/22    Page 27 of 28

EXHIBIT A

*7.5.1, Administration of Specialized Inmate Housing Procedures Manual*
*Section 2 – Capital Case Unit (CCU) Phase I Inmates*

(5)    Office of Population Management.

e.  After the Capital Case inmate has been transported back to his/her home facility, the Office of Chief Counsel shall notify the following persons:

(1)    Governor's Office; and

(2)    General Counsel's Office.

3.  Re-socialization Assistance

a.  For CCU inmates on the active mental health roster, psychology staff and treatment teams shall ensure that each inmate's ITP includes elements designed to aid the inmate in re-socialization and transition from a segregated setting to a general population setting.

b.  For any CCU inmate on the active mental health roster whose participation in OOC opportunities falls below 25 hours in two weeks of any four week period, that inmate's treatment team will engage the inmate in a confidential setting to encourage the inmate to accept more OOC opportunities and modify the ITP as needed to promote that goal. Treatment teams shall be responsible for creating a written action plan for achieving that goal.

c.  For inmates not on the active mental health roster, if any inmate's acceptance of OOC opportunities falls below 25 hours in two weeks of any four week period, the individual responsible for tracking OOC time and creating OOC logs for the unit will initiate a **DC-97, Mental Health Referral Form** to psychology staff. Psychology staff shall respond to the referral by meeting with the inmate to ascertain the reason for non-participation in OOC activities, and develop an individualized written recovery plan to encourage greater participation if clinically indicated.

4.  Audit of group programming

The Licensed Psychologist Manager shall conduct a programming audit of any group program offered in the CCU no less frequently than every 90 days, to analyze participation rates, continued appropriateness of the group or program subject matter, and other issues associated with the continued offering of a particular group or program. The audit will be written and provided to the Office of Chief Counsel.

**Q. News Media**

1.  Requests for interviews with a Phase I inmate shall be handled in accordance with Department policy **DC-ADM 009, "News Media Relations."**

2.  All statutes, regulations, and policies that govern visits and telephone calls between a Capital Case inmate and the general public shall be used when responding to news media requests for interviews with a specific Capital Case inmate.

2-10

EXHIBIT A

### R.  Modification of Sentence and Transfer to Standard General Population

1.  If DOC staff receive an order modifying the sentence of a Capital Case inmate to life imprisonment because of a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine the validity of the order in accordance with Department policy **11.5.1, "Records Office Operations."** If the order is valid and effective, then the inmate may be moved from the Capital Case unit.

2.  Any questions concerning moving a Capital Case inmate from a Capital Case unit shall be referred to the appropriate Executive Deputy Secretary for Institutional Operations (EDSI)/Regional Deputy Secretary.

### S.  Conversion to Phase II

When an Execution Warrant is signed by the Governor, or a Notice of Execution is issued by the Secretary, the inmate is to be converted to Phase II status. Phase II Capital Case inmate procedures shall be in accordance with Department policy **6.5.8, "Capital Case Administration."**

Issued: 12/3/2019
Effective: 12/10/2019