IN THE
# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

No. 3: 21-CV-1819
Before the Honorable Christopher C. Conner

**George Ivan Lopez**, *et al.*,
Plaintiffs,

versus

**John E. Wetzel**, *et al.*,
Defendants.



---

# Brief in Opposition
## to Defendants' Partial Motion to Dismiss

---

Six disabled, incarcerated plaintiffs jointly filed this § 1983 civil-rights action against the Pa. Department of Corrections and three former Secretaries of Correction. Plaintiffs raise facial and as-applied violations of the 8th and 14th Amendment, and a violation of the Americans with Disabilities Act, stemming from decades-long stints in solitary confinement.

Defendants have moved to dismiss. Plaintiffs hereby oppose.

---

George Ivan Lopez, Darien Houser,
Gerald Watkins, Ralph Stokes,
Jose Uderra, Richard A. Poplawski,
Plaintiffs, pro se.

S.C.I. Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

_17th_ Day of April, 2022

*Easter Sunday*

# Table of Contents

**Table of Citations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

**Questions Involved** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Statement of Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Summary of the Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

**Legal Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    8th Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    14th Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    **I.  Plaintiffs' 8th Amendment rights were violated.**    7

    **II. Plaintiffs' 14th Amendment rights were violated.**    8

        **1. Plaintiffs had a liberty interest in being free from prolonged isolation.**    8

        **2. The "processes" afforded were inadequate and meaningless.**    9

        **3. The plaintiffs have pleaded a violation of substantive due process.**    9

    **III. Defendants do not carry their burden to establish qualified immunity.**    10

        **1. Qualified immunity itself is unlawful.**    10

        **2. Defendants had fair and clear warning that their conduct was unlawful.**    11

            *(a) The dangers of isolation were noted a century ago by the Supreme Court.*    11

            *(b) A scientific consensus about the harms of isolation emerged long before the plaintiffs were released from solitary confinement.*    11

            *(c) Defendants were aware of the scientific consensus and had explicitly acknowledged the risks associated with isolation identical to the plaintiffs'.*    14

i

    (d) The DOJ alerted the defendants to the violations inherent in holding disabled persons, like the plaintiffs, in indefinite solitary confinement.   15

    (e) The ACLU alerted the defendants to the unlawfulness of the plaintiffs' confinement.   15

  3. Defendants' deliberate indifference precludes entitlement to immunity.   16

  4. The right to be free from baseless, prolonged isolation was clearly established; the nature of the plaintiffs' sentences was an irrelevant distinction.   16

    (a) It was clearly established that baselessly holding disabled, suicidal prisoners in prolonged solitary confinement—which featured aggravating factors, including unsanitary conditions and sleep deprivation—violates the 8th Amendment.   17

    (b) It was clearly established that holding prisoners in indefinite solitary confinement—without penological justification or meaningful review—violates the 14th Amendment.   20

    (c) The plaintiffs' death sentences, per se, were irrelevant distinctions.   22

  5. The cruelty of the defendants' conduct was obvious.   24

  IV. Plaintiffs properly brought their ADA claim against a public entity.   25

Conclusion   25

Certificate of Compliance - Word Count   attached

Certificate of Service   attached

## Table of Citations

*Allah v. Bartkowski*, 574 F. App'x 135 (3d Cir. 2014)                 17-20

*Anderson v. Creighton*, 483 U.S. 635 (1987) . . . . . . . . . . . 21

*Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001)              16

*Brown v. Ore. Dep't of Corr.*, 751 F.3d 983 (9th Cir. 2014) . . . . . . . 21

*Burns v. Pa. Dep't of Corr.*, 642 F.3d 163 (3d Cir. 2010)           22, 23

*Carter v. Philadelphia*, 181 F.3d 339 (3d Cir. 1999) . . . . . . . . . 16

*Clark v. Beard*, 918 A.2d 155 (Pa. Commw. 2007)                    22

*Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000) . . . . . . . . . . 21

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)                 9

*Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988) . . . . . . . 18

*Davis v. Ayala*, 576 U.S. 257 (2015)                               11

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) . . . . . . . . 17

*Dongarra v. Smith, et al.*, No. 20-2872 (3d Cir., March 1, 2022)     6

*E.D. v. Sharkey*, 928 F.3d 299 (3d Cir. 2019) . . . . . . . . . . . 6

*Estate of Lagano v. Bergen Cnty. Prosecutor's Office*,
    769 F3d 850 (3d Cir. 2014)                                      16-17

*Farmer v. Brennan*, 511 U.S. 825 (1994) . . . . . . . . . . . . 5

*Finley v. Huss*, 723 F. App'x 294 (6th Cir. 2018)                  18

*Fogle v. Pierson*, 453 F.3d 1252 (10th Cir. 2006) . . . . . . . . . 18

*Fussell v. Vannoy*, 584 F. App'x 270 (5th Cir. 2014)               18

*Glossip v. Gross*, 576 U.S. 863 (2015) . . . . . . . . . . . . . 11

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)                         16

*Hanrahan v. Doling*, 331 F.3d 93 (2d Cir. 2001) . . . . . . . . . . 21

*Hicks v. Feeney*, 770 F.2d 375 (3d Cir 1985)          16, 22, 23

*Hollihan v. Pa. Dep't of Corr.*, 159 F. Supp. 3d 502  (M.D. Pa. 2016)    3, 16

*Hope v. Pelzer*, 536 U.S. 730 (2002) . . . . . . . . . . . . . . 7, 22-24

*Hutto v. Finney*, 437 U.S. 678  (1978)    5

*Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015) . . . . . . . . . . 21

*Isby v. Brown*, 856 F.3d 508 (7th Cir. 2017)    21

*Johnson v. Carter*, 620 F.2d 29 (3d Cir. 1980) . . . . . . . . . . 4

*Johnson v. Wetzel*, 209 F.Supp. 3d 766  (2016)    1, 15

*Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994)    4

*Kane v. Barger*, 902 F.3d 185 (3d Cir. 2018)    20

*Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017) . . . . . . . . . . 24

*Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996)    18

*Longford v. City of Atlantic City*, 235 F. 3d 845 (3d Cir. 2000) . . . . . . 4

*L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235  (3d Cir. 2016)    9, 16, 22

*Magluta v. Sample*, 375 F.3d 1269 (11th Cir. 2004) . . . . . . . . . 21

*Medley, In re*, 134 U.S. 160 (1890)    11

*Meriweather v. Faulkner*, 821 F.2d 408 (7th Cir. 1987) . . . . . . . . 18

*Mims v. Shapp*, 744 F.2d 946 (3d Cir. 1984)    6

*Myers v. Anderson*, 238 U.S. 368 (1915) . . . . . . . . . . . . 10

*Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017)    12, 17-20

*Pearson v. Callahan*, 555 U.S. 223 (2009) . . . . . . . . . . . . 6

*People of Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F.2d 139 (3d Cir. 1984)    23

*Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) . . . . . . . . . 18

*Porter v. Pa. Dep't of Corr., et al.,* 974 F.3d 431 (3d Cir. 2020)    19-20

*Prieto v. Clarke,* 136 S. Ct. 319 (2015) . . . . . . . . . . . .    14

*Quintanilla v. Bryson,* 730 F. App'x 738 (11th Cir. 2018)    18

*Quinn v. Nix,* 983 F.2d 115 (8th Cir. 1993) . . . . . . . . .    24

*Renchenski v. Williams,* 622 F.3d 315 (3d Cir. 2010)    5

*Renfro v. Unisys Corp,* 67 F.3d 314 (3d Cir. 2011) . . . . . . . . .    4

*Reynold v. Wagner,* 128 F.3d 166 (3d Cir. 1997)    6

*Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650 (7th Cir. 2012) . . . .    18

*Saucier v. Katz,* 533 U.S. 194 (2001)    17

*Selby v. Caruso,* 734 F.3d 554 (6th Cir. 2011) . . . . . . . . . . . .    21

*Shepard v. Quillen,* 840 F.3d 686 (9th Cir. 2016)    18

*Shoats v. Horn,* 213 F.3d 140 (3d Cir. 2000) . . . . . . . . . . . . .    6, 8

*Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410 (3d Cir. 2000)    6

*Trop v. Dulles,* 356 U.S. 86 (1958) . . . . . . . . . . . . . .    25

*Walker v. Shansky,* 28 F.3d 666 (7th Cir. 1994)    18

*Wallace v. Baldwin,* 895 F.3d 481 (7th Cir. 2018) . . . . . . . . .    18

*Wilkerson v. Goodwin,* 714 F.3d 845 (5th Cir. 2014)    21

*Wilkinson v. Austin,* 545 U.S. 209 (2005) . . . . . . . . . . .    5, 9, 20

*Williamson v. Stirling,* 912 F.3d 154 (4th Cir. 2018)    18

*Williams v. Sec'y Pa. Dep't of Corr.,* 848 F.3d 549 (3d Cir. 2017) . . . . .    *passim*

*Williams v. Lane,* 851 F.2d 867 (7th Cir. 1988)    24

*Wilson v. Seiter,* 501 U.S. 294 (1991) . . . . . . . . . . . . .    5

## Laws, Statutes, Rules, and Regulations

U.S. Constitution, Amendment VIII                                    *passim*

U.S. Constitution, Amendment XIV . . . . . . . . . . . . . . . .      *passim*

42 U.S.C. § 1983                                                     1, 10

Federal Rule of Civil Procedure 12(b)(6) . . . . . . . . . . . . .    4

Pa. DOC Administrative Directive 802                                 14, 15

## Other Sources

Appelbaum, K., *American Psychiatry Should Join the Call to Abolish
    Solitary Confinement*, 43 J. AM. ACAD. PSYCHIATRY & L. 406 (2015)    13

ASCA & Liman Center for Public Interest Law at Yale Law School,
    REFORMING RESTRICTIVE HOUSING (2018)                                 13

Baude, W., *Is Qualified Immunity Unlawful?*
    106 CALIFORNIA LAW REVIEW 45, 58–60 (2018)                           10

Brinkley-Rubinstein, L., *et al.*, *Association of Restrictive Housing
    During Incarceration With Mortality After Release*,
    2 JAMA NETWORK OPEN (Oct. 2019)                                      13

Engdahl, D., *Immunity and Accountability*,
    44 COLORADO LAW REVIEW 1 (1972)                                      10

Hailer, B., *Were the 2015 Reforms on Solitary Confinement in PA
    Enough to Protect Vulnerable Inmates?*,
    PUBLIC SOURCE, Nov. 7, 2018                                          15

Haney, C. & Lynch, M., *Regulating Prisons of the Future:
    A Psychological Analysis of Supermax and Solitary Confinement*,
    23 N.Y.U. REV. L. & SOC. CHANGE 477 (1997)                          11, 12

Kupers, T., *SHU Post-Release Syndrome: A Preliminary Report*,
    17 CORR. MENTAL HEALTH REPORT 81 (2016)                              13

Liman Program at Yale Law School & ASCA,
    TIME-IN-CELL: THE ASCA-LIMAN 2014 NATIONAL SURVEY OF
    ADMINISTRATIVE SEGREGATION IN PRISON (2015)                          13

McEwen, B., *et al.*, *Stress Effects on Neuronal Structure:*
    *Hippocampus, Amygdala, and Prefrontal Cortex,*
    41 NEUROPSYCHOPHARMACOLOGY 3 (2015)      12

Prosser, W., HANDBOOK ON THE LAW OF TORTS (1941)      10

Smith, D., *Neuroscientists Make a Case Against Solitary Confinement,*
    SCIENTIFIC AMERICAN (Nov. 2018)      12

Williams, T., *Prison Officials Join Movement to Curb Solitary*
    *Confinement*, N.Y. TIMES, Sept. 2, 2015      14

## Questions Involved

**I.**   Have the plaintiffs adequately pleaded violations of the 8th Amendment?

**II.**   Have the plaintiffs adequately pleaded procedural and substantive due-process violations under the 14th Amendment?

**III**.   Have the defendants carried their burden to establish immunity from liability as to either constitutional claim?

**IV.**   Have the plaintiffs properly brought their ADA claim against a public entity?

## Statement of Facts

When the Constitution of these United States was ratified in the wake of the War for Independence, it contained no sections or clauses that would plausibly support "qualified immunity" for government officials who violate that Constitution. Nor did the text of the 1871 Ku Klux Klan Act's first section, better known as Section 1983.

As if to disregard the promise of precious liberty, the system of punishment now commonly known as "solitary confinement" was invented here in the Commonwealth of Pennsylvania. Before the 19th century was out, the High Court had taken notice that this form of confinement caused catatonia and insanity. As the 20th century progressed, the scientific, medical, and legal communities arrived at a national consensus: isolating social creatures is profoundly cruel and damaging.

As a new century dawned, the Civil Rights Division of the U.S. Department of Justice ("DOJ") wrote to Pa. Governor Tom Corbett, alerting him that the Pa. DOC employed solitary confinement in a way that violates the rights of prisoners, like the plaintiffs, who have disabilities. Exhibit A. Defendants acknowledged the danger: in this very Court, Defendant Wetzel stated that "he is familiar with [clinical literature], which sets forth at length the harmful effects of solitary confinement." *Johnson v. Wetzel*, 209 F.Supp. 3d 766, 779 (2016).

Notwithstanding their knowledge, the defendants continued to hold the plaintiffs in isolation. Compl. ¶¶ 177–180. Plaintiffs were deprived of exercise, sleep, nutrition, hygiene, peace of mind, human contact, personal property, and any and all forms of mental stimulation. Compl. ¶¶ 17–66. The plaintiffs had to cope with the disturbing, unsanitary conditions of their so-called "Restricted Housing Units." Compl. ¶¶ 25–29. The plaintiffs—all of whom are disabled individuals—were denied access to educational, vocational, and recreational programming and other services offered by the DOC, a public entity. Compl. ¶¶ 42–54.

Every so often, the plaintiffs' continued confinement was automatically continued after sham "hearings." Compl. ¶¶ at 184–190. No meaningful attempt was made by DOC officials to determine whether the plaintiffs were dangerous, or to otherwise justify their indefinite detention. *Id.* Plaintiffs were given no way out—except suicide. Compl. at p. 2.

Following on the heels of the DOJ's report, the American Civil Liberties Union made the defendants aware of the extreme risk posed to *these plaintiffs specifically*. But the defendants did not change their policies until almost three more years went by, and only then under the threat of pending litigation. Compl. ¶ 20, 65.

## Summary of the Argument

As to the constitutional claims, the defendants assert immunity from liability—though they do not contest the underlying *violations*—before going on to raise a frivolous objection to the plaintiffs' ADA claim. Hence, the bulk of this brief seeks to put the defendants to their burden of establishing immunity, an affirmative defense. Officials may be taking it for granted, but the plaintiffs respectfully submit that qualified immunity is not available for at least five interrelated, compound reasons:

2

➤ **(1)** Qualified immunity itself is unlawful.

➤ **(2)** The defendants had fair and clear warning that their conduct was unlawful:

    **(a)** the dangers of isolation were noted a century ago by the Supreme Court;

    **(b)** a scientific consensus about the harms of isolation emerged long before the plaintiffs were released from solitary confinement;

    **(c)** the defendants were aware of the scientific consensus and explicitly acknowledged the risks associated with isolation identical to the plaintiffs';

    **(d)** the U.S. DOJ alerted the defendants to the violations inherent in holding disabled persons, like the plaintiffs, in indefinite solitary confinement;

    **(e)** the ACLU alerted the defendants to the unlawfulness of the *plaintiffs' confinement specifically*.

➤ **(3)** Deliberate indifference precludes entitlement to qualified immunity.

➤ **(4)** The right to be free from baseless, prolonged isolation was clearly established; the nature of the plaintiffs' sentences is an irrelevant distinction.

➤ **(5)** The cruelty of the defendants' conduct was obvious.

    Simply put, the defendants knew that decades-long isolation in harsh conditions ran afoul of the Constitution. Yet they showed persistent, *determined* indifference. And it is axiomatic that such a state of mind is inconsistent with a finding of reasonable conduct—a requisite for entitlement qualified immunity. *See, e.g., Hollihan v. Pa. Dep't of Corr.*, 159 F. Supp. 3d 502, 513 (M.D. Pa. 2016) (Conner, C.J.)

    As the Court pursues the immunity inquiry, it should not focus unduly on the plaintiffs' sentences; rather, the Court should focus on the plaintiffs' humanity and disabilities. Given the total absence of any penological justification, the plaintiffs' death sentences were incidental, *irrelevant*—a mere factual wrinkle. And nothing about them immunized the plaintiffs from the deleterious effects of solitary confinement. Because the plaintiffs are human beings and the defendants had ample, unambiguous warning as to the obvious cruelty of their conduct, the defendants should enjoy no immunity.

All the while, the plaintiffs were deprived of due process. The defendants failed to provide *meaningful* periodic reviews—opportunity for the plaintiffs to be heard by the decision-makers—and failed to provide any guidance on how to be released from solitary confinement. Solely because of their sentences, the plaintiffs were isolated indefinitely. No legitimate penological rationale was given. Even now, the defendants offer none.

Along the way, the defendants were indifferent that their conduct was causing and exacerbating the plaintiffs' disabilities. Furthermore, they did nothing to accommodate the plaintiffs' growing need for access to the programs and services offered to all other prisoners in DOC custody. The defendants assert that, under the ADA, the plaintiffs cannot recover monetarily from individuals. That's right. But the plaintiffs brought their claims against the Department itself, a public entity. So, at minimum, the plaintiffs' ADA claim can go forward.

## Legal Standards
### Motion to Dismiss

To survive a motion to dismiss, the plaintiffs are only required to plead "enough facts to state a claim to relief that is plausible on its face." *Renfro v. Unisys Corp*, 67 F.3d 314, 321 (3d Cir. 2011). A court considering a motion to dismiss for failure to state a claim brought under Fed. R. Civ. P. 12(b)(6) "must also accept as true the factual allegations in the complaint." *Longford v. City of Atlantic City*, 235 F. 3d 845, 847 (3d Cir. 2000). The court must construe the facts and reasonable inferences in the light most favorable to the non-moving party. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). The burden is on the moving party to show there are no actionable claims. *Johnson v. Carter*, 620 F.2d 29 (3d Cir. 1980).

## 8th Amendment

To establish a plausible 8th Amendment claim, the plaintiffs must show (1) deprivation of a sufficiently serious, identifiable human need (objective), and (2) that the defendants were aware of, and deliberately indifferent to, the risks created by the conditions (subjective). *Farmer v. Brennan*, 511 U.S. 825, 840 (1994). The court may consider a condition that does not meet the objective requirement by itself, if, in combination with other conditions, these produce a "mutually reinforcing effect" that causes deprivation of a single, identifiable human need. *Wilson v. Seiter*, 501 U.S. 294, 298, 304 (1991).

The subjective component requires the plaintiffs to show that the defendants were aware of, and deliberately indifferent to, risks posed by the conditions. *Farmer*, 511 U.S. 837. A substantial risk may be found from the very fact that it is obvious. *Id.* at 840 –42 n. 8. The Supreme Court has recognized that "the length of confinement [in isolation] cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto v. Finney*, 437 U.S. 678, 689 (1978).

## 14th Amendment

For plaintiffs to establish a 14th amendment procedural due-process claim, they must allege facts sufficient to plausibly show: (1) that the plaintiffs had a protected liberty interest, and (2) that the relevant processes were insufficient to protect that interest. *Wilkinson v. Austin*, 545 U.S. 209 (2005).

A liberty interest arises when state action "imposes an atypical and significant hardship in relation to the ordinary incidents of prison life." *Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010) (internal citation omitted).

5

Due process is "flexible" and calls for such procedural protections as a particular situation demands in order to minimize the risk of error. *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 421 (3d Cir. 2000). Courts determine what procedures are constitutionally required by looking the "particular rights and interests at stake." *Reynold v. Wagner*, 128 F.3d 166, 179 (3d Cir. 1997) (internal citation omitted). With respect to prisoners held in solitary confinement, prison officials are required to periodically review the prisoners' circumstances. *Mims v. Shapp*, 744 F.2d 946, 953 (3d Cir. 1984). The prisoner must be provided a chance to be heard by the official "charged with deciding" if he should be released from solitary confinement. *Shoats v. Horn*, 213 F.3d 140, 145 (3d Cir. 2000).

Qualified Immunity

A qualified immunity analysis has two parts: first, the court determines whether a right has been violated. Then, the court decides if the right at issue was clearly established such that a reasonable person would have known that the conduct was unlawful. *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 557 (3d Cir. 2017).

The Supreme Court has "recognized that it is often appropriate and beneficial to define the scope of a constitutional right" by first asking whether a violation has occurred. *Id.* at 558. Starting with the violation "promotes the development of constitutional precedent." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dongarra v. Smith, et al.*, No. 20-2872, slip op. at 5 (3d Cir., March 1, 2022) ("Jumping ahead [to the second step of qualified immunity] stunts the development of constitutional law.").

Qualified immunity is an affirmative defense; the defendants bear the burden of demonstrating their entitlement to it. *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019).

6

## Argument
### I. Plaintiffs' 8th Amendments rights were violated.

The defendants do not dispute that the plaintiffs' allegations are sufficient to establish a violation of the 8th Amendment. Nor could they. The atrocious conditions on the plaintiffs' housing units—alone, apart from the isolation—were sufficient to establish a violation. On top of brutal environments, the plaintiffs were subjected to social isolation and sensory deprivation. By doing so, the defendants deprived the plaintiffs of basic human needs: sleep, exercise, nutrition, hygiene, physical and mental health, peace of mind, social interaction, and environmental stimulation. And it lasted for *years*.

The conditions of the plaintiffs' confinement (which are adequately pleaded throughout the complaint) substantially align with—or are far worse than—the conditions described in the extensive literature (cited below) as objectively harmful. Plaintiffs indeed suffered the kinds of damages common to victims of solitary confinement. *See* Compl. ¶¶ 90–99, 100–111, 112–118, 119–126, 127–134, 135–144.

As argued in the section on qualified immunity, the defendants were well aware of the obvious fact that prolonged isolation causes injury. Despite the defendants' knowledge, they were indifferent: they took no action—*for decades*—to ameliorate the plaintiffs' harsh conditions.

All of this happened in the absence of a legitimate penological objective. Compl. at ¶¶ 174–176 (citing studies that explode the myth of death-condemned prisoners as "the worst of the worst"). Lack of a legitimate purpose for their isolation means that the plaintiffs' suffering was gratuitous, and supports an inference that prison officials were deliberately indifferent. *Hope v. Pelzer*, 536 U.S. 740, 737–38 (2002).

## II. Plaintiffs' 14th Amendments rights were violated.

The defendants do not dispute that the plaintiffs' allegations are sufficient to establish a violation of the 14th Amendment. The defendants' framing of the question conflates the violation with the availability of an immunity defense. *See* Def. Br. at 3. Even if the defendants had immunity, that would not negate the underlying violation.

### 1. The plaintiffs had a liberty interest in being free from prolonged isolation.

The plaintiffs' allegations are sufficient to establish that they had a protected liberty interest in being free from harsh solitary confinement imposed indefinitely. Prisoners may have a liberty interest if they an show that, but for the discretion of administrators, they would be in population. *Shoats*, 213 F.3d at 142–44. These defendants were empowered to release the plaintiffs from isolation at any time. Compl. at ¶ 190. The best evidence of this fact is that, eventually, they did. *Id.* at ¶ 65.

The hardships endured by the plaintiffs were "atypical and significant" under any plausible baseline. But the Third Circuit Court of Appeals has made clear that the liberty interest analysis must be conducted in comparison to the baseline conditions in *general population*—not on death row:

> [W]e judged [a prior litigant's] condition in relation to the *ordinary* incidents of prison life, or relative to *routine* prison conditions. The terms ordinary and routine direct us to use a general metric (the general population), not one specific to a particular inmate.
>
> *Williams*, 848 F.3d at 564 (cleaned up; emphasis in original).

For this reason, the plaintiffs took care to plead the "Ordinary Incidents of Prison Life" for general population prisoners. Compl. ¶¶ 67–89. Against that baseline, the plaintiffs' conditions were plainly atypical and presented significant hardships.

Furthermore, even if the defendants did have a legitimate penological objective

(such as anything inherent in having an active death sentence) for keeping the plaintiffs isolated indefinitely—which they did not—that would be irrelevant to the liberty interest inquiry. *Wilkinson*, 545 U.S. at 224.

**2. The "processes" afforded were inadequate and meaningless.**

Because the plaintiffs had a liberty interest in avoiding solitary confinement, they were entitled to "regular and meaningful" review of their placement. "Meaningful" is the benchmark against which any question of adequate process is judged. *Williams*, 848 F.3d at 575–76. Periodic reviews are "not an inconvenient ritual intended to shelter officials from liability so that they may mechanically" renew placement in isolation. *Id.* Instead, the reviews must serve as "guards against arbitrary decision-making" *Id.* at 576 (quoting *Wilkinson*, 545 U.S. at 226). The defendants owed the plaintiffs a genuine opportunity to contest their continued confinement in restrictive housing.

That's not what happened, however. There were sham "hearings" which offered no opportunity for release: the plaintiffs "could not even hope to be released based on prison PRC review because these *pro forma* assessments did not consider the necessity of their severe conditions of confinement." *Id.* at 562. Compl. ¶¶ 184–190. Such an automated "mechanical" ritual was constitutionally inadequate.

**3. The plaintiffs have pleaded a violation of substantive due process.**

The substantive due process clause prohibits "certain government actions regardless of the fairness of the procedures used to implement them." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016). Among the government conduct that is forbidden by this clause is "that which shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Defendants' treatment of the plaintiffs does just that.

9

### III. Defendants do not carry their burden to establish qualified immunity.

### 1. Qualified immunity itself is unlawful.

This Court would search in vain for the textual basis of "qualified immunity" in the Constitution or 42 U.S.C. § 1983. Supporters offer that it's an unwritten defense, imported from the common law. Read § 1983 against the historical background of tort liability to find such "good-faith" defenses, the argument goes.

But such defenses were not available in 1871 when § 1983 was passed. Suits against officials for constitutional violations did not permit good-faith defenses: "the strict rule of personal official liability" was a fixture of the founding era. D. Engdahl, *Immunity and Accountability,* 44 Colo. L. Rev. 1, 19 (1972). What mattered was legality.

Sure, subjective intent or motive may have been an *element* of certain common-law torts, but was never the basis for broad immunity. W. Baude, *Is Qualified Immunity Unlawful?* 106 Cal. L. R. 45, 58–60 (2018). In William Prosser's 1941 treatise, he noted that "courts are [*presently*] being driven slowly" to extend good-faith-based defenses, even to officials acting under unconstitutional statutes. HANDBOOK ON THE LAW OF TORTS 153–54. Only two of the cases Prosser cited predate 1871—and those disagree. *Id.* Even after § 1983 was enacted, the Supreme Court rejected good-faith immunity for constitutional violations. *See*, e.g., *Myers v. Anderson*, 238 U.S. 368, 378–79 (1915).

The conclusion is inescapable and deliciously ironic: qualified immunity was, itself, *not clearly established*. Instead, it is a judge-made expediency untethered to text or tradition—an extended foray into the legislative sphere. Any doctrine of dubious provenance that countenances tyranny, while muffling constitutional exposition, ought to be jettisoned overboard like a fat crate of overtaxed black tea.

**2. The defendants had fair and clear warning that their conduct was unlawful.**

*(a) The dangers of isolation were noted a century ago by the Supreme Court.*

Solitary confinement is a stain on the American conception of liberty—an affront to dead Patriots—a kind of "original sin" surpassed only by the repugnancy and hypocrisy of slavery. The dire consequences of solitary confinement in America were famously remarked upon by such illustrious foreign dignitaries as Alexis de Tocqueville and Charles Dickens. The Supreme Court took notice in 1890:

> [t]he prisoners fell, even after a short [solitary] confinement, into a semi-fatuous condition, . . . and others became violently insane; while those who with[]stood the ordeal better . . . did not recover sufficient mental activity to be of any subsequent service to the community.
>
> *In re Medley*, 134 U.S. 160, 168.

More than a century later, members of the Supreme Court revisited the topic. Justice Kennedy wrote about the "terrible price" imposed by isolation. *Davis v. Ayala*, 576 U.S. 257, 289 (2015). That same year, Justice Breyer noted: "It is well documented that . . . prolonged solitary confinement produces numerous deleterious harms." *Glossip v. Gross*, 576 U.S. 863, 908 (2015) (dissenting opinion) (collecting sources).

*(b) A scientific consensus about the harms of isolation emerged long before the plaintiffs were released from solitary confinement.*

The defendants were surely aware of the emerging national consensus. The Third Circuit has recognized the "unmistakable conclusion[s]" of the clinical literature on the harms of solitary confinement. *Williams*, 848 F.3d at 566 (quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477, 500 (1997)). This conclusion is supported by a "robust body of legal and scientific authority recognizing

the devastating mental health consequences caused by long-term isolation in solitary confinement." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017). Indeed, "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Williams*, 848 F.3d at 566 (quoting Haney & Lynch at 531).

"Solitary confinement is strikingly toxic to mental functioning." *Id.* at 567 (quoting Haney & Lynch at 534). The plaintiffs' conditions "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self-identity." *Palakovic*, 854 F.3d at 225. Indeed, "even a short time in solitary confinement is associated with drastic cognitive changes." *Williams*, 848 F.3d at 567.

And "the damage does not stop at mental harm." *Palakovic*, 854 F.3d at 226. Solitary confinement consistently results in physical harm as well. For example, isolation often precipitates a decline in neural activity and shrinks the hippocampus and amygdala, structures critical to decision-making, memory, and emotional regulation. *E.g.*, Dana G. Smith, *Neuroscientists Make a Case Against Solitary Confinement*, SCIENTIFIC AMERICAN (Nov. 2018); Bruce S. McEwen, et al., *Stress Effects on Neuronal Structure: Hippocampus, Amygdala, and Prefrontal Cortex*, 41 NEUROPSYCHO-PHARMACOLOGY 3 (2015).

"[T]he lack of opportunity for free movement" in solitary is also "associated with more general physical deterioration. The constellations of symptoms include dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation or pre-existing medical problems." *Williams*, 848 F.3d at 568. A study of 225,000 former

prisoners found that survivors of solitary confinement were at a disproportionate risk of premature death when compared to prisoners generally. Lauren Brinkley-Rubinstein, *et al.*, *Association of Restrictive Housing During Incarceration With Mortality After Release*, 2 JAMA NETWORK OPEN, 1, 5–6, 9 (Oct. 2019). That is, research consistently demonstrates that solitary confinement causes damage that is extreme compared to the harms experienced by prisoners in general population. *See also* Kenneth L. Appelbaum, *American Psychiatry Should Join the Call to Abolish Solitary Confinement*, 43 J. AM. ACAD. PSYCHIATRY & L. 406, 410 (2015).

What's more, it has been clear that solitary confinement's adverse effects do not stop once an inmate in removed from its harsh conditions. Rather, the devastating conditions of solitary confinement may continue to impact prisoners even decades after they are released into a less restrictive environment. Terry A. Kupers, *SHU Post-Release Syndrome: A Preliminary Report*, 17 CORR. MENTAL HEALTH REPORT 81, 92 (2016).

In recent years, the leading correctional associations have also called attention to the unique dangers of prolonged solitary confinement. For example, the Association of State Correctional Administrators ("ASCA")—of which Defendant Wetzel was once the President—repeatedly emphasized the harm caused by isolation. ASCA & Liman Center for Public Interest Law at Yale Law School, REFORMING RESTRICTIVE HOUSING 6 (2018) (recognizing the "national and international consensus that restrictive housing imposes grave harms"); The Liman Program at Yale Law School & ASCA, TIME-IN-CELL: THE ASCA-LIMAN 2014 NATIONAL SURVEY OF ADMINISTRATIVE SEGREGATION IN PRISON 3–4 (August 2015) (outlining ASCA's efforts to reduce solitary over the years, including a special subcommittee in 2012 and the adoption of guidelines aimed at

reducing isolation in 2013). Likewise, the American Correctional Association ("ACA") has stated that "prolonged isolation . . . is a grave problem," and expressed commitment to an "ongoing effort to limit or end extended isolation." Timothy Williams, *Prison Officials Join Movement to Curb Solitary Confinement*, N.Y. TIMES, Sept. 2, 2015.

Corrections officials themselves actually have advocated against isolation. For example, in 2015, sixteen "corrections directors and administrators with first-hand experience supervising solitary confinement units," including the former president of the ACA and ASCA, filed an *amicus* brief urging Supreme Court review of a decision blessing automatic solitary confinement for death-sentenced prisoners. *See* Brief of Amici Curiae Corrections Experts, *Prieto v. Clarke*, 136 S. Ct. 319 (2015) (No. 15-21). They observed that solitary is "uniquely mentally and physically debilitating," *id.* at 12, and confirmed that "there is no penological justification for automatic and permanent confinement of death-sentenced inmates in extreme isolation." *Id.* at 17.

*(c) The defendants were aware of the scientific consensus and explicitly acknowledged the risks associated with isolation identical to the plaintiffs'.*

Defendants cannot claim that they were unaware of the danger. Department policy concerning solitary confinement demonstrates their actual knowledge that the pratice is dangerous. To start, the DOC policy regarding placement in isolation states: "If the inmate has a mental illness, the [review committee] should explore the feasibility of placing him/her into [alternative units]." Pa. DOC Administrative Directive 802 § 1(A) (5). This passage reflects knowledge that isolation has dangerous effects on mental health. (The plaintiffs never benefitted from this policy, though.)

Likewise, DOC's criteria concerning eventual *release* from solitary confinement

demonstrates the defendants' knowledge of its perils. Among the "factors [that] shall be evaluated in making a decision to continue or release an inmate" from isolation are "length of time" in Restricted Housing Units. *Id.* at § 4(A)(3). That's an explicit acknowledgement that prolonged isolation is harmful. (Why did it not apply to the plaintiffs?)

Defendant Wetzel is on record admitting his awareness of solitary confinement's grave risks. In this Court, Wetzel conceded that he was familiar with the work of Dr. Craig Haney, which sets forth the harmful effects of solitary confinement; he acknowledged "that isolation should be used 'only . . . in very narrow circumstances when it's absolutely necessary.'" *Johnson,* 209 F. Supp.3d at 779 (quoting Wetzel).

### (d) The DOJ alerted the defendants to the violations inherent in holding disabled persons, like the plaintiffs, in indefinite solitary confinement.

In February 2014, the DOJ wrote to Pa. Governor Tom Corbett to inform him that that "the Commonwealth uses solitary confinement in ways that violate the rights of prisoners with [serious mental illness/intellectual disabilities]." Ex. A at 1 ¶ 3. After that, the defendants enacted sweeping reforms. *See* Brittany Hailer, *Were the 2015 Reforms on Solitary Confinement in PA Enough to Protect Vulnerable Inmates?*, PUBLIC SOURCE, Nov. 7, 2018. (discussing Pa's 2015 policy prohibiting inmates with serious mental illness—except for the plaintiffs—from being confined for 22 hours each day).

### (e) The ACLU alerted the defendants to the unlawfulness of the plaintiffs' confinement.

The defendants were even made aware of the extreme risk of harms posed to *these plaintiffs specifically*. In February 2017, the ACLU sent the defendants a seven-page letter outlining the harm they were causing the plaintiffs. Ex. B. Four months later, the defendants wrote back, indicating that they would not be changing their policies.

Ex. C. They didn't release the plaintiffs until years later—late 2019. Compl. ¶ 20, 65.

### 3. Defendants' deliberate indifference precludes entitlement to immunity.

The well-pleaded allegations in the complaint, taken as true, establish that the defendants had actual knowledge of an excessive risk to the plaintiffs. When bolstered by the circumstances outlined in this brief, it becomes evident that the defendants displayed an egregious, *determined* indifference: over shockingly long periods of time, they ignored that harm was certain to befall the plaintiffs.

Relying on Third Circuit precedent, this Court has found such indifference fatal to a qualified-immunity defense. *Hollihan*, 159 F. Supp. 3d at 513 (Conner, C.J.). Purposefully disregarding actual knowledge of an excessive risk can never be objectively reasonable. The concepts are incompatible. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (citing *Carter v. Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999)).

### 4. The right to be free from baseless, prolonged isolation was clearly established; the nature of the plaintiffs' sentences was an irrelevant distinction.

When the Supreme Court revamped its qualified immunity doctrine in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), it presented a "puzzle" for circuit courts to sort out. *Hicks v. Feeney*, 770 F.2d 375, 379 (3d Cir 1985). Plaintiffs discern two elements in that puzzle (which are often muddled or conflated): first, at what level of specificity must the right at issue be defined? then, how much factual congruity is required between the case at bar and the body of precedent claimed to have established the right thus articulated?

"Defining the right at issue is critical." *L.R. v. School Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016). Indeed, district courts of this circuit have suffered reversal for defining the right too broadly (for example, *id.*), or too narrowly (e.g., *Estate of Lagano v.*

*Bergen Cnty. Prosecutor's Office*, 769 F3d 850, 859 (3d Cir. 2014). So the plaintiffs first calibrate their instruments to examine the issue from the appropriate altitude, "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Since the defendants—the burden-holders—neglected the task, the plaintiffs offer fair statements of the rights that they're advancing (written as subheadings a & b), then identify root for those legal principles in binding decisional law.

Finally, the plaintiffs circle back to tackle the factual-affinity question, which itself becomes a double-lobed inquiry: how much is required by law? and how much is here? The ostensible distinguishing feature of this case, however plausible, is illegitimate. This case is more than analogous enough (to precedent) to preclude immunity.

*(a) It was clearly established that baselessly holding disabled, suicidal prisoners in prolonged solitary confinement—which featured aggravating factors, including unsanitary conditions and sleep deprivation—violates the 8th Amendment.*

Defendants are not entitled to qualified immunity because the state of the law at the time of their conduct gave them ample warning that isolating a prisoner for decades under restrictive conditions offends the 8th Amendment. They needed to look no further than this circuit's precedent. *Palakovic*, 854 F.3d at 226 (finding inmate's multiple 30-day stints in isolation "more than sufficient to state a plausible [8th Amendment] claim"); *Allah v. Bartkowski*, 574 F. App'x 135, 138–39 (3d Cir. 2014) (finding six years of solitary confinement in unsanitary conditions stated 8th Amendment claim).

The fair warning of the Third Circuit is buttressed by "a robust 'consensus of cases of persuasive authority.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (citation omitted). Other courts of appeals have held that placing prisoners in damaging conditions of solitary is harmful enough to violate the 8th Amendment even

17

when prisoners experience those conditions for far shorter periods. For example:

- *Meriweather v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987) (reversing dismissal and noting that confinement in administrative segregation for periods of up to five months "may constitute cruel and unusual punishment in violation of the 8th Amendment");

- *Davenport v. DeRobertis*, 844 F.2d 1310, 1311–13 (7th Cir. 1988) (8th Amendment violated where prisoners isolated for 90 days; noting "isolating a human being from other humans year after year or even month after month can cause substantial psychological damage");

- *Walker v. Shansky*, 28 F.3d 666, 668–69, 673 (7th Cir. 1994) (reversing summary judgment, denying qualified immunity on 8th Amendment claims related to 10-month isolation);

- *Keenan v. Hall*, 83 F.3d 1083, 1089–91 (9th Cir. 1996) (8th Amendment claim stated where prisoner in solitary confinement denied meaningful exercise, exposed to unsanitary conditions, excessive noise, and constant illumination for one year);

- *Fogle v. Pierson*, 453 F.3d 1252, 1259–60 (10th Cir. 2006) (8th Amendment claim stated where prisoner in solitary confinement for almost three years denied meaningful exercise);

- *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012) (claim stated where prisoner isolated for seven months: "prolonged confinement in administrative segregation may constitute a violation of the 8th Amendment . . . depending on the duration and nature of the segregation and whether there were feasibly alternatives to that confinement");

- *Fussell v. Vannoy*, 584 F. App'x 270, 271 (5th Cir. 2014) (per curiam) (holding that decades in solitary confinement stated 8th Amendment claim);

- *Shepard v. Quillen*, 840 F.3d 686, 691 (9th Cir. 2016) (reversing grant of summary judgment and denying qualified immunity because "horrors of solitary confinement" were sufficient to "chill a 'person of ordinary firmness' from complaining");

- *Williamson v. Stirling*, 912 F.3d 154, 184 (4th Cir. 2018) (holding jail officials not entitled to qualified immunity after imposing isolation without process, explaining "our society has learned much about the physical and mental health impacts of solitary confinement");

- *Wallace v. Baldwin*, 895 F.3d 481, 484–85 (7th Cir. 2018) (describing "negative psychological effects" of isolation, and holding that solitary subjected mentally ill prisoner to "imminent danger of serious bodily injury");

- *Quintanilla v. Bryson*, 730 F. App'x 738, 740, 743–48 (11th Cir. 2018) (describing social isolation inherent to solitary confinement, holding that inflicting it without adequate procedure states due process and conditions claims);

- *Finley v. Huss*, 723 F. App'x 294, 299 (6th Cir. 2018) (holding that three-month solitary confinement of mentally ill prisoner states 8th Amendment claim);

18

Against all this, the defendants attempt to depict this case as "identical," Def. Br. at 9, to *Porter v. Pa. Dep't of Corr., et al.,* where the plaintiff sued after being left on death row despite his overturned capital sentence. 974 F.3d 431 (3d Cir. 2020). Liability for Porter's 8th Amendment claim was barred by qualified immunity, the court held.

But the defendants are ignoring several dimensions to this action that bring it far closer to *Palakovic* and the persuasive body of cases formed by *Allah* and the volumes of extrajurisdictional authority. The clearly established principle that these plaintiffs advance has nothing to do with death sentences. Call the concept *Solitary+,* that is, prolonged isolation *plus* some additional factor(s) to make it a little more cruel.

In *Palakovic*, the *plus* was mental illness and suicidality. This action features that, too. There's even an ADA claim attached. Such things were absent from *Porter*. These plaintiffs' psychiatric conditions—some pre-existing, some caused by the violation—are well-pleaded in the complaint. Most plaintiffs plead specific suicidal behavior, too. In the complaint's introduction, the plaintiffs noted that the only way to escape their ordeal was suicide. (That comment may not be a numbered averment, but the entire complaint is verified. These plaintiffs nearly became victims, like Brandon Palakovic, whose will to live was tragically overcome by his 30-day stints in isolation.)

In *Allah,* the *plus* was unsanitary conditions and sleep deprivation. That's here. Compl. at ¶¶ 25, 26, 36. Many out-of-circuit cases feature a lack of meaningful exercise, lack of nutrition, etc. These things are present. *Id.* at ¶¶ 29, 37, 50, 53. (Some of these claims were probably available to Porter, too, but he didn't press them in his advocacy.)

This case is not merely another iteration of *Porter*, this time featuring plaintiffs on the wrong side of a vacated death sentence. The plaintiffs are proceeding under the

theory of *Solitary+*, a "premise" with "clear applicability" here. *Hope*, 536 F.3d at 743. At minimum, the plaintiffs require discovery in order to bolster their theory of greater factual affinity with *Palakovic, Allah, et alia*, than with *Porter*. A jury trial could be necessary to sort out matters of pure fact. Dismissal is not appropriate at this stage.

*(b) It was clearly established that holding prisoners in indefinite solitary confine-*
*ment—without penological justification or meaningful review—violates the 14th*
*Amendment.*

In *Wilkinson v. Austin,* the Supreme Court held that prisoners have a liberty interest in avoiding conditions of solitary confinement less restrictive than those endured here. 545 U.S. at 223–24. Unlike in this case, the prisoners in *Wilkinson* were placed in solitary because they were security risks. *Id.* at 215. The Third Circuit, too, has concluded that inmates who endured conditions substantially similar to the plaintiffs' have a liberty interest in avoiding continued solitary confinement: *Shoats,* 213 F.3d at 144; *Allah*; 574 F. App'x at 138–39.

The cases cited (and others in this brief) do not involve death-row prisoners, but that should not derail this Court's analysis. In *Williams,* a death-row case indisting-uishable from *Porter,* the court relied upon "the scientific consensus and the recent precedent involving non-death row solitary confinement" because "[t]hose decisions advance our inquiry into the unique, yet analogous" situation on the capital case unit. 848 F.3d at 574. *Porter,* too, cited non-capital cases to support the same conclusion. 974 F3d at 449. So both *Williams* and *Porter* analogized non-capital due-process rights to death-row prisoners'. This Court should, too.

In any event, this Court "do[es] not require a case directly mirror[ing] the facts at hand, so long as there are sufficiently analogous cases." *Kane v. Barger,* 902 F.3d 185,

195 (3d Cir. 2018) (citations omitted). There are indeed suffciently analogous cases,

such as those already discussed, plus these:

- *Colon v. Howard*, 215 F.3d 227, 221–22 (2d Cir. 2000) (holding that solitary confinement for 305 days gave rise to a due-process liberty interest);

- *Hanraham v. Boling*, 331 F.3d 93, 99 (2d Cir. 2001) (affirming denial of qualified immunity on a procedural due process claim brought by inmate who had been in isolation for 10 years);

- *Magluta v. Sample*, 375 F.3d 1269, 1277–80 (11th Cir. 2004) (holding that an inmate who spent more than 500 days in solitary confinement stated a procedural due process violation);

- *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2011) (finding a liberty interest for inmate who spent 13 years in solitary confinement);

- *Brown v. Ore. Dep't of Corr.*, 751 F.3d 983, 987–88 (9th Cir. 2014) (holding that an inmate who spent 27 months in isolation had a liberty interest in avoiding further confinement);

- *Wilkerson v. Goodwin*, 714 F.3d 845 (5th Cir. 2014) (denying qualified immunity "no reasonable prison official could conclude that continuing four decades in indefinite solitary confinement would not implicate a liberty interest protected by due process");

- *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) (holding that prisoner had liberty interest in avoiding extended isolation; "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even [afterward.]");

- *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (holding that inmates who had been in segregation for over ten years had a liberty interest in avoiding continued isolation);

The plaintiffs identify *Williams* (2017)—bolstered by a persuasive consensus—as establishing the due-process right to be free from indefinite, unnecessary isolation. There is no doubt that *Williams*' holding was couched in terms specific to that case[1] (as holdings tend to be), but it's the "*reasoning*, not the holding" that gives voice to the principle, *Hope*, 536 U.S. at 743, and adequate shape to the "contours of the right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

1. In passing, the court mentioned that active death sentences might "arguably" require isolation. 848 F.3d at 569. That question was not before the court. It noted that, given state law, harsh conditions might be within the expected perimeters of a capital sentence. *Id.* That statute-based commentary was regrettable in light of its rejection in *Clark v. Beard*, 918 A.2d 155, 160 (Pa. Commw. 2007). Defendants were rebuffed when they later tried, in *Porter*, to capitalize off these *Williams*-court dicta. 974 F.3d at n.9.

The court found that the *Williams* plaintiffs could not be held in isolation "after the initial justification [death sentences] for subjecting them to such extreme deprivation ceased to exist." *Id.* at 569. But what if that reason never really existed?

*(c) The plaintiffs' death sentences,* per se, *were irrelevant distinctions.*

If the sole distinguishing feature of this case turns out to be substantively immaterial, does that bring the case closer to being "sufficiently analogous" to overcome a claim to immunity? *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163 (3d Cir. 2010). The plaintiffs have one final chore before putting the Capital-Case Boogeyman Myth to death, once and for all. In order to assess what constitutes "sufficient" factual similarity, it might please the Court to examine this chart:

| "exact congruence" *rejected by L.R. v. Sch. Dist. of Phila.* | "fundamentally similar" *rejected by Hope v. Pelzer* | "materially similar" *rejected by Hope v. Pelzer* | "sufficently analogous" *Burns v. Pa. Dep't of Corr.* | "some factual correspondence" *Hicks v. Feeney* | Entirely distinguishable |
|---|---|---|---|---|---|
| ◄ Greater factual congruity | | | Less factual congruity ► | | |

If immunity applied in all cases short of "exact congruence," *L.R. v. School Dist. of Phila.,* 770 F.2d at 248, officials would have free rein to befoul the Constitution as long as they were innovative—which is pretty much what the Eleventh Circuit was willing to allow in *Hope v. Pelzer.* Once the Supreme Court took over, *Hope* became a warning to the circuits about "the dangers of a rigid overreliance on factual similarity." 536 U.S. at 742. Rights can be established even in "novel factual circumstances." *Id.* at 741. The High Court expressly rejected the idea that cases must be "fundamentally" or "materially similar" to overcome qualified immunity. *Id.* (Contrariwise, officials must be immune in entirely distinguishable situations; a functional society requires that officials

22

not be paralyzed in performing discretionary functions.)

In the wake of *Harlow*, the Third Circuit, wisely avoiding the trend taking shape in the Eleventh and others, "rejected the strict standard in favor of a more flexible approach requiring *some factual correspondence.*" *Hicks,* 770 F.2d at 380 (citing *People of Three Mile Island v. Nuclear Regulatory Comm'rs,* 747 F.2d 139, 143 (3d Cir. 1984)) (emphasis added). Our circuit's more permissive standard was eventually validated by the teachings of *Hope v. Pelzer.*

The "some factual correspondence" standard requires (a) "an inquiry into the general legal principles governing analogous factual situations," and (b) "a determination whether the official should have related this established law to the instant situation," *Hicks,* 770 F.2d at 80. This same passage is quoted by more recent cases, which equate it to "determin[ing] whether a new scenario is *sufficiently analogous* to previously established law." *Burns,* 642 F.3d at 177 (emphasis added).

Since the plaintiffs have examined analogous cases and synthesized appropriately specific statements of the rights established, all that's left is determining whether "a reasonable official would have foreseen the analogy." *Id.* at 179. If so, immunity is barred.

The Court must consider all "the information then available" to the plaintiffs. *Id* at 177. This brief has outlined the overwhelming mountain of studies, reports, memoranda, and personalized letters. Some of these pertained to these very plaintiffs. The defendants did not need to draw an analogy—the DOJ and ACLU performed that service. *See* Exs. A–C. *See Hope,* 536 at 745 (noting the existence of a DOJ report).

At this point, the defendants must offer some meaningful distinction, some justification for their constitutionally abhorrent conduct. The factor is evident: the

plaintiffs' active death sentences. That's the distinction. But is it *meaningful*?

What is the difference between death-row prisoners and general-population prisoners? Answer: Death-condemned inmates are actually *less* likely to commit violence in prison. *See* Compl. at ¶ 175–176 (collecting studies). Defendants have been aware of this—at the latest—since *Williams* was decided in 2017. 848 F.3d at n. 180 (listing three more studies, some going back as far as 1996).

So the defendants' penological justification was specious—plausible but *false*. Courts have been known to deny immunity to prison officials whose security interests are found lacking. *See*, e.g., *Quinn v. Nix*, 983 F.2d 115, 119 (8th Cir. 1993); *Williams v. Lane*, 851 F.2d 867, 882–82 (7th Cir. 1988).

Given that the sole distinguishing quality of this case has now been exposed as immaterial, any definition of the applicable right would be an "unduly narrow construction" if it references death sentences at all. *Lagano*, 769 F.3d at 859. Those sentences—active or not—were mere "factual wrinkle[s]" incapable of destroying the analogy of the plaintiffs' case to prior precedent. *Three Mile Island*, 747 F.2d at 143. The defendants' "specific conduct" was "sufficiently factually similar" to *Palakovic*, *Williams*, and the consensus, to provide fair notice that their conduct was unconstitutional. *Kane*, 902 F.3d at 196 (citing *Kedra v. Schroeter*, 876 F.3d 424, 449 (3d Cir. 2017)).

In a world where qualified immunity applies unless there is "exact," "fundamental," or "material" similarity, the defendants prevail. But in the Third Circuit, where "some factual correspondence" defeats immunity, the defendants, instead, must fail.

## 5. The cruelty of the defendants' conduct was obvious.

Even absent closely analogous cases in which the applicable legal premises were

established, the defendants would be liable "given the egregiousness" of their conduct. *Kane*, 902 F.3d at 195. That is, the conscience-shocking peril of the plaintiffs' prolonged exposure to needless isolation constituted "obvious cruelty" in excess of what the Supreme Court condemned in *Hope v. Pelzer,* 536 U.S. at 745.

Like Larry Hope, the plaintiffs were "treated in a way antithetical to human dignity." *Id.* Like Hope, their "wanton treatment was not done of necessity." *Id.* Meanwhile, "scientific research and the evolving jurisprudence" had, by 2017, "made clear" that the plaintiffs' "mental well-being" and "sense of self" were at risk. *Williams*, 848 F.3d at 575. It's not "rocket science." *Id.* There are "few values more worthy of constitutional protection than these core values of human dignity." *Id.*

The Third Circuit's choice of words was significant, for the "dignity of man" happens to be *the* "basic concept underlying the Eighth Amendment," which "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). Here, the standards of decency *had* evolved, but the defendants knowingly fell behind the marching progress of society.

So they must pay.

### IV. The plaintiffs properly brought their ADA claim against a public entity.

The plaintiffs (disabled persons) are suing the Pa. DOC (a public entity), for violations of the ADA. The plaintiffs do *not* attempt to hold individuals responsible for monetary damages. Compl. at 28 ("All Plaintiffs v. Pa. DOC").

## Conclusion

Plaintiffs have alleged facts sufficient to establish violations of their rights and the defendants are not entitled to qualified immunity. Their motion should be **DENIED**.

Submitted respectfully,


George Lopez, #CZ3198

Darien Houser, #GL7509


Gerald Watkins, #DD5212

Ralph Stokes, #AY9034


Jose Uderra, #CC3832

Richard Poplawski, #KB7354


All resident at:
State Correctional Institution Phoenix
1200 Mokychic Drive
Collegeville, PA 19426


Date:

Easter Sunday
April 17th, 2022

## Certificate of Compliance - Word Count

The plaintiffs properly sought prior authorization, under the Middle District's Local Rule 7.8, to exceed the word-count limit. We sought an extra 1,000 words.

We are proud to certify that we've submitted a brief that complies with that extended limit. Our word-processing software (Microsoft Word*Pad*) does not have a word-count feature. But we have a method to estimate: there's an average of 12 words on each line, and the average page (given headers, etc.) has about 20 lines of text. That's approximately 240 words per page.

There are 25 pages of true text, from the Questions Involved to the Conclusion (not counting the signature page and these certificates). The total is 6,000 words.

Granted, there are dense pages filled with block quotes. But the plaintiffs specifically refrained from using formatting tricks to fake compliance. The whole brief only has one footnote (!); it features double-spaced, left-justified, 13-point text in gorgeous Georgia typeface. There are 1-inch margins all around. *May it please the Court.*

## Certificate of Service

We plaintiffs hereby certify, subject to the penalties prescribed by 28 U.S.C. § 1746, that we have mailed a copy of the foregoing brief to counsel for the defendants via first-class U.S. Mail (postage pre-paid), on the date indicated below:

**Kim Adams, Esquire**
PADOC Office of General Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

Date _4 / 17 / 22_

George Ivan Lopez

Richard A. Poplawski

