IN THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA
SEP 1 2 2022
PER ___ _I₿₂___
              DEPUTY CLERK

| | | |
|---|---|---|
| **George Ivan Lopez** *et al.*, | ❖ | No. 21-CV-1819 |
| Plaintiffs, | ❖ | (Hon. Christopher C. Conner, J.) |
| v. | ❖ | (Hon. Karoline Mehalchick, C.M.J.) |
| **John E. Wetzel** *et al.*, | ❖ | |
| Defendants. | ❖ | § 1983 Civil Rights |

## Memorandum of Law
### in Support of Plaintiffs' Joint Motion for Appointment of Counsel

*Should the Court request counsel to represent these plaintiffs?*

Yes. It would actually be a prudent draw on scarce resources. Considering that the defendants have cherry-picked this case to litigate common legal issues affecting dozens of similar cases, appointing counsel would benefit judicial economy and lessen the risk of inconsistent adjudications.

That's the biggest reason, but we plaintiffs also satisfy the elements of the traditional appointment-of-counsel inquiry. For starters, we've already garnered a favorable recommendation from a magistrate judge. That speaks to the merit of our case. And we have no money, so the Court can conduct the *Tabron* test.

Some of us, at least, are capable of presenting and responding to motions. But that ability cannot fairly be imputed to all six co-plaintiffs. Our diversity of legal aptitude neutralizes the ability-to-litigate factor. In any event, writing motions is one thing, but presenting a case in court is something else entirely.

This has turned out to be a legally complex case. The spectre of a circuit split (about qualified immunity in the deliberate indifference context) has already been raised. How can six convicts sort out what Courts of Appeals cannot? Plus, there's the

1

arcane liberty-interest question, a budding challenge to the very legality of qualified immunity itself, the intricacies of the Americans with Disabilities Act, and possible class-action certification, too. None of this is pro se territory.

This case's injunction-only predecessor action, *Reid v. Wetzel*, required counsel to sift through 20,000+ documents. We can't do that. DOC regulations only permit us to have four boxes at a time. In *Reid*, counsel also hired some big guns, including nationally renowned expert on solitary confinement, Dr. Craig Haney. That's not something we can manage on our own. And we couldn't properly handle the in-court swearing contest that might arise between inmates and DOC officials, each testifying to their own version of conflicting facts.

The undersigned is heavily burdened and is struggling with the ethical implications of aiding his co-plaintiffs in good faith. We need help. If at all possible, this Court should request counsel.

### Preliminary Statements

By design, this is not a joint memorandum; it is submitted by one plaintiff: me, Richard A. Poplawski. The point I'm driving—and I'll cover this in detail—is that the Court should, at this stage, make an individualized assessment of each plaintiff. Unless and until we are all fused together by class certification, we plaintiffs are not a monolith. The Court should recognize our diversity, which bears on each man's ability to present his claims (i.e., is highly relevant to our motion for counsel). While I technically cannot advocate *on behalf of* my co-plaintiffs, everything I say will pertain to their causes, too, and thus, by its very Truth, will militate in favor of granting our joint motion.

Also by design, I intend to use first-person pronouns throughout. I respectfully take this unorthodox liberty in order to emphasize the nature and reality of the moment: I am a layman beseeching this Honorable Court for representation. Since I am, as yet, without anybody to speak on my behalf, the third-person perspective is misleading. In this unique situation, I dispense with that artifice. May it please the Court.

☆

In our joint motion, we also asked for class certification. Because we despaired of our "legal qualification[s]" to brief such a pivotal motion, we demurred and left it to the expertise of yet-to-be-obtained counsel.

While pro se litigants cannot legally represent (or certify?) a class, it is acceptable and necessary that the request for counsel be supported. This memorandum is intended to treat the motion for counsel as a *predicate* request: since we assert that we require counsel even absent class certification, this Court can safely apply the traditional lines of inquiry into such motions. This memo guides that analysis.

☆

What immediately follows this section is a *special* statement of the case, which I offer to help the Court see where this action fits into the wider dreamscape of past (and pending) litigation spawned by Pennsylvania's Nightmare on Death Row. We'll review this case's predecessor, the injunction-only class action that brought the decades-long nightmare to its belated end.

Once we awoke to reforms on the capital-case unit, dozens of identical actions seeking compensation sprung up, in all three federal districts, like little pink morning

mushrooms. Now clustered predominantly in the Eastern District, those actions will be examined, with particular attention focused on how appointment of counsel has been handled in that district.

### The Case in Context

Sometime in 2016, a coalition of civil-rights organizations, headed by the American Civil Liberties Union of Pennsylvania, finally became concerned about the vengeful atrocity being committed against death-condemned prisoners throughout the Commonwealth. The ACLU wrote Defendant Secretary of Corrections John Wetzel in February 2017 to advise him that "the severity and length of isolation imposed on death-sentenced prisoners . . . raises serious constitutional, human rights, and human dignity questions." Letter from Witold Walczak, 2/13/17. Four months later, Wetzel wrote back, announcing his intent to maintain capital-case administration as it had been.

So in January 2018, the ACLU, joined by the Abolitionist Law Center and several prestigious law firms, filed suit on behalf of five prisoners and a class of similarly situated persons. *Reid et al. v. Wetzel et al.*, #18-CV-0176 (M.D. Pa.). Counsel declined to present a highly-sought-after request for compensatory relief.

The Honorable Judge John E. Jones, III, later granted an unopposed motion to certify a so-called "injunction only" class, under Fed.R.Civ.P.23(b)(2), consisting of "all current and future death-sentenced prisoners in the Commonwealth of Pennsylvania." Negotiations to reform Death Row began in earnest.

Had a person been thrown into solitary confinement on the day the *Reid* complaint was filed—or on the date of class certification, or even later—clinical literature suggests that his or her poor soul would have been irreversibly damaged by the time the

parties reached an agreement and published notice to the class in November 2019. A few weeks later, the defendants officially made effective their revamped policy 7.5.1. "Administration of Specialized Inmate Housing."

Judge Jones approved the settlement in the spring of 2020. It's hard to say precisely what date—whether the adoption of 7.5.1. in December 2019, or final approval of the settlement on April 9, 2020—marked the true end of a barbarous era in Pennsylvania, but we all know what happened next: the COVID pandemic struck and thrust the whole of modern society into near-chaos. Class members, who had just begun to breathe relief, were stuffed back into their little holes. In essence, it felt like being re-victimized. (Although, this time, the world got a little taste of social isolation . . . and didn't much care for it.)

The plaintiff class endured its last collective panic attack as COVID ran its deadly course. Eventually, society emerged from the pandemic more-or-less recognizably intact. Interestingly, though, the *Reid* Agreement never fully commenced: as of this writing, no class member has received the baseline physical and psychological evaluations that are prescribed by the Agreement, § V(D). (Are the defendants stalling because of this new round of litigation?) The Technical Compliance Team has never seen the inside of SCI Phoenix. Implementation and monitoring of the settlement is at a cold, hard standstill.

Meanwhile, class members began struggling, unaided, with integration into our new population-like setting, and many of us felt justified in pressing our claims to compensation. In the *Reid* Agreement, the defendants disclaimed liability, of course; but they were not released from it, either. So new actions began cropping up as the two-year

statute of limitations (counting from the adoption of 7.5.1.) approached.

First, there was a trickle. Then a template complaint began circulating around the capital-case unit. Soon, groups of plaintiffs were joining up and mobbing clerks in all three federal districts—and the local county courthouse, too. Defendants failed in their efforts to concentrate the litigation in this Court, although they had some success removing cases from state court and transferring cases from West to East. All told, a little less than half the men on the unit (about 50 of 110) are involved:

| | | |
|---|---|---|
| *Boxley*, 21-4468 | *Busanet*, 21-4286 | *Cash*, 21-4748 |
| *Clemons*, 21-5232 | *Conforti*, 21-5293 | *Hackett*, 21-5140 |
| *Hannibal*, 21-4732 | *Hicks*, 21-4719 | *Hitcho*, 21-5173 |
| *Johnson*, 21-4857 | *Marinelli et al.*, 21-5215 | *Morales*, 21-4765 |
| *Murphy*, 21-4436 | *Natividad*, 21-4754 | *Padilla*, 21-5083 |
| *Perez*, 21-4796 | *Reid et al.*, 21-5108 | *Rivera*, 21-4524 |
| *Robinson*, 21-4844 | *Robinson*, 21-4715 | *Staton*, 21-5016 |
| *Thomas*, 21-4469 | *Lopez et al.*, 21-1819 | *Spotz*, 21-1799 |

(All cases are *versus Wetzel et al.* in the E.D. Pa., save *Lopez* and *Spotz* (M.D.). Two cases, *May et al.*, and *Harris*, removals from state court, are missing from this list. *Stollar*, 21-1515 (W.D.), was voluntarily withdrawn, but is pending potential re-opening under Fed.R.Civ.P. 60(b).)

The judges of the Eastern District, *sua sponte*, decided that counsel would be needed. The Pennsylvania Institutional Law Project ultimately entered their appearance in the designated lead case: *Busanet*, #21-4286. Whenever anybody else in the East asks for counsel, they are told:

> "Given the consolidation of these actions with [*Busanet*], and the appointment of the Institutional Law Project in that case, the Court expects that common legal issues affecting all the cases will in the first instance be thoroughly considered in that action."
>
> *Staton v. Wetzel*, #21-5016, Doc. 21 (7/29/22).

Deploying counsel to a select case is an imperfect but practical solution. But the defendants aren't proceeding according to Judge Austin McHugh's explicit expectations;

they've cherry-picked this case in which to litigate the "common legal issues" that will impact the rights of 50 other plaintiffs.

In other words, the defendants are hoping to evade the expertise of the professionals and secure a broad judgment in this pro se action. So we're seeking counsel to level the playing field. In fact, we hope to get attorneys in time to help us bury the defendants' immunity defense. Otherwise, we could get stuck defending the interlocutory appeal that they threaten in their renewed motion to stay discovery.

I appreciate the defendants' apparent vote of confidence in our legal acumen. We're doing the best we can. But my co-plaintiffs and I are overburdened: the interests of the whole unit—whether their constitutional rights, and their suffering, will be vindicated—are riding on *this* Court's decision, in *this* case, right now. That's heavy. That's too much weight to place upon amateurs.

This Court probably agrees. But, unlike the defendants, I take nothing for granted. So I proceed to apply the traditional test for appointment of counsel.

### Legal Standard

Once a court determines that the case has "some merit," *Parham v. Johnson*, 126 F.3d 454, 457 (3d Cir. 1997), the following six *Tabron* factors are considered:

(1) the plaintiff's ability to present the case;
(2) the complexity of the legal issues;
(3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;
(4) the extent to which the case is likely to turn on credibility determinations;
(5) whether the case will require expert testimony;
(6) whether the plaintiff can afford counsel.

*Id.* (citing *Tabron v. Grace*, 6 F.3d 147, 155-57 (3d Cir. 1993)).

### Appointment of counsel is appropriate here, because . . .
### 1. Our case has merit.

At least, the Hon. Karoline Mehalchick thinks so. Her Honor would deny the defendants' bid for qualified immunity because our right to "adequate mental health treatment" and our "liberty interests and rights to procedural due process" were clearly established at the time of the violation. Report & Recommendation at 15, 20. Ultimately, this Court will determine whether to adopt those findings, but our merit argument has much to recommend it—including the Middle District's Chief Magistrate Judge.

And the defendants did not even attempt to have the ADA claims fully dismissed. Those go forward no matter what. So the case crosses the threshold. This Court may consider the *Tabron* factors.

### 2. We can't pay a lawyer.

Just a moment. Here's another threshold inquiry. The Third Circuit Court of Appeals might not denominate it as such, but if a plaintiff has an ability to pay for counsel, that should be immediately fatal to an appointment request.

Luckily (or not?), we plaintiffs stand before this Court with our pockets turned inside-out like the Monopoly Man on his worst day. Five of us were granted IFP status. *See* Plaintiffs' individual declarations, filed separately. Plaintiff Lopez scraped up the filing fee only because he's a PLRA strikeout artist, not because he could afford it.

A good attorney would probably ask for tens of thousands of dollars. We won't earn that amount—*put together*—in the rest of our lives (if we remain stuck working for slave wages in the DOC). Plaintiff Uderra has been released, but he's trying to get on his feet financially after 30 years on Death Row.

We cannot afford an attorney. So what *can* we do?

### 3. Some of us can litigate—to a point.

In 1961, Joseph Heller made a signal contribution to the English language, of which any man-of-letters might be envious. In his novel *Catch-22*, pilots who expressed their unwillingness to fly dangerous missions proved their sanity, thus qualifying themselves to fly those missions against their will. Volunteers flew too, of course. There was no avoiding the peril.

So, is it possible to write a request for counsel that is of such quality that it defeats its own object? Might a court find that the very fact that it found itself persuaded (of the need for counsel) proves that counsel is not needed? It's fun to think about. In practice, I'm sure a fairminded jurist easily pierces the apparent dilemmatic logic. But the irony of flexing one's amateur litigation skills—in a memorandum supporting a request for counsel—is thick enough to be problematic.

That's why I'm writing alone today: to convey to the Court that whatever legal abilities it has detected—and I'd like to believe there has been *some*—should not, in fairness, be imputed to all plaintiffs in such a way that prejudices their individual interest in our joint motion for counsel.

Simply put: there's some disparity-of-ability among our group. It's not fair to my co-plaintiffs if they're considered ineligible for appointed counsel just because they're participating in an action alongside somebody who has acquired an unusual appetite for English usage guides, legal-writing manuals, and the Atlantic Reporter. These guys have their own things going on. I'm the word-processing nerd. Plus, I spent far less time in mind-melting isolation than did any of the rest of them. I didn't get quite the same dose

of damage (administered by the defendants) as they did.

In fairness to my fellows, and in all candor toward this tribunal, I'm not the only one who knows a little bit about the law. Our individual declarations were geared toward the sub-factors built into this prong of the *Tabron* test. The Court can assess each man's education, literacy, and litigation history without the need for me to speak on their behalf—which, legally, I cannot do.

But I can make some limited comments premised on my own observations and what I see in the record before this Court. For example, Plaintiff George Lopez avers that he has difficulty with English, which is compounded by his dyslexia. *See* Lopez Declaration. I would note subject to the penalties prescribed by 28 U.S.C. § 1746: I have observed that Lopez's specialty as an Inmate Legal Reference Aide is helping those Spanish-speaking prisoners for whom language is a prohibitive barrier. Those are unique and indispensible skills, but they do little to help him plead and present his case in a United States District Court.

Sure, Lopez has a litigation history that could be characterized as extensive. *Id.* at ¶ 4. But I'm not sure mere *numbers* is what counts in this regard. It is telling that Lopez has "struck out" under the PLRA. *Id.* at ¶ 7. This same principle could apply to Darien Houser's mixed results in court. *See* Houser Dec. at ¶ 4. And to my own. Poplawski Dec. at ¶ 4.

If somebody learned how to get aircraft off the ground consistently, but, more often than not, wound up crashing the planes into the mountains, nobody should infer from his take-off skills that he does not need an expert pilot.

My own example is instructive. I have competently drafted several complaints in my brief "career." But I've never been out of the pleading stage as a plaintiff in a civil action. The next request for discovery that I make will be my first. I've never been faced with a motion for summary judgment. And if it comes to conducting a trial? Forget about it. "The filing of papers is one thing but presenting a case in court is quite another." *Woodham v. Sayre Bor. Police Dep't,* 191 Fed. Appx. 111, 115 (3d Cir. 2006).

Since the law recognizes the obvious—that the "ability to present and respond to motions . . . does not conclusively establish [plaintiffs'] ability to present [their] own case[s]." *Parham,* 126 F.3d at 459—the ability-to-litigate factor, which, on its face, weighed heavily against the plaintiffs, is probably neutral.

Some courts apologetically suggest that, given the practice of construing pro se sub-missions liberally, *Haines v. Kerner,* 404 U.S. 519 (1972), plaintiffs don't really need attorneys anyway. That's unconvincing logic. That principle would weigh, by definition, against the plaintiff in every single application of the *Tabron* factors. The Third Circuit Court of Appeals did not craft a pre-loaded test.

Besides, courts are quick to seize on pro se mistakes and admonish that pro se status confers no special benefits. All the convoluted rules of court are still in effect. *Mala v. Brown Bay Marina, Inc.,* 704 F.3d 239, 245 (3d Cir. 2013). In Pennsylvania, courts remind those contemplating the pro se plunge that "any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing." *Dove v. York Cnty.,* 2013 U.S. Dist. LEXIS 163575, n. 2 (M.D. Pa.) (*quoting Commonwealth v. Adams,* 882 A.2d 496, 498 (Pa. Super 2005))

I'm hoping to keep from coming undone. In the complaint, ¶ 136, I wrote about my propensity to "crash" and leave tasks unfinished. That's indicative of a mental disorder, which became much worse, year by year, because of isolation-induced despair. My co-plaintiffs have their own personal impairments, as indicated in their declarations. It's baked into the nature of our claims. Such considerations fit into the ability-to-litigate inquiry—which is starting to tilt, through neutral territory, slightly in favor of granting the motion.

If the Court accepts that argument, as it should, then a magic key turns. A close reading of the *Tabron* test reveals that the factors we've reviewed so far form a top-tier trifecta: "If it appears that [1] an indigent plaintiff with [2] a claim of arguable merit is [3] incapable of presenting his or her own case, serious consideration should be given to appointing counsel." *Tabron*, 6 F.3d at 156. In fact, *Tabron* says that "if such a plaintiff's claim is truly substantial," as here, "counsel should ordinarily be appointed." *Id.* at 157.

We should have counsel. All the rest is icing on the cake. But nobody likes cake without icing, so I examine the remaining, very-much-secondary factors. (It may be somewhat abridged, though, because our response to the defendants' objections is due in three days. May the Court please understand and excuse me.)

### 4. This case is legally complex.

It turned out to be *far* more intricate than it seemed at first. Start with the obvious: "a § 1983 civil-rights case alleging deliberate indifference to a prisoner's serious medical needs can raise sufficiently complex legal issues to require appointment of counsel." *Parham*, 126 F.3d at 459. That quote is about *physical* medical needs; this case implicates the inscrutable mysteries of the human mind.

That's just the beginning. Enter the inherently imprecise doctrines built up around qualified immunity, which I contend that is unlawful on its ugly, tyrannous face. That determination required some modest historical analysis of founding-era tort liability. Doc. 46 at 18. From there, it was twists and turns through the Reconstruction Era, on to the 20th century's watershed case, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

Even courts immediately perceived Harlow as a "puzzle." *Hicks v. Feeney*, 770 F.2d 375 (3d Cir. 1985). The defendants' strategy is to just *ignore* it, but we plaintiffs tried to crack the code on pages 24-25 of our brief opposing dismissal. Qualified immunity is fiendishly tricky. Courts get it wrong all the time, judging by the reversals.

Then there's the interplay between that species of immunity and deliberate indifference, with its built-in objective and subjective elements. This has caused a rift between the circuits. See, e.g, the concurring and dissenting opinion of Judge Matheson in *Burgaz v. Board of Comm'rs for Jefferson Cnty.*, 30 F.4th 1181 (10th Cir. 2022) (collecting and comparing cases). Somebody call the Supreme Court.

With those two pieces of machinery whirring in the background, start up the arcane liberty-interest inquiry. Actually— back up a step—the concept of *due process* has notoriously defied precise definition by the most eminent jurisprudential minds in the Anglo-American tradition. Somewhat like *obscenity*, courts know it when they see it.

And it's hard to make out in the prison context. When the seminal case of *Sandin v. Conner* first laid out the "atypical and significant hardship" standard for those convicts still interested in liberty, Justice Ginsburg openly fretted that nobody would be able to "fathom" it. 515 U.S. 472 at 484, 490 n. 2 (1995). Indeed, the circuits went their separate ways in establishing the baseline for "ordinary incidents of prison life." *See* Pl.

Br. opposing objections, § II(A) (forthcoming).

So much for the easy stuff. Next comes the Americans with Disabilities Act, whose intricacies aren't fully appreciated by some lawyers who study it for a living. I haven't even gotten to that part yet, but I'm sure it is, ironically, full of pitfalls and various other legalistic booby traps.

It looks distant on the horizon from here, but there still remains the possibility of class certification. Now, we plaintiffs are a part of the *Reid v. Wetzel* class, so we have some experience. But the law is clear on this: pro se litigants cannot represent a class. *Hagan v. Rogers,* 570 F.3d 146, 158-59 (3d Cir. 2009). We could probably cannibalize parts of the *Reid* motion for class certification, soup up the *commonality* part until it satisifies the *predominance* requirement for a (b)(3) damages class, and let the *superiority* argument make itself.

But then we'd run into the disability-based sub-class. Imagine a Venn diagram between the ADA and Fed.R.Civ.P. 23. In the middle section is where dragons live—who are invincible against all foolish pro se adventurers.

We should have counsel because this is a complex case, even moreso than *Reid*, where class counsel and the defendants both argued complexity in their respective memoranda* in support of approving the settlement. #18-CV-0176, docs. 101 and 102.

---

\* Hopefully I won't be judicially estopped from arguing complexity here, since I countered the proponents' complexity argument in my own brief *opposing* approval of the *Reid* agreement. Doc. 120 at 10-14. Of course, qualified immunity was not a potential defense in that injunction-only class action, which also did not feature ADA claims.

Br. opposing objections, § II(A) (forthcoming).

So much for the easy stuff. Next comes the Americans with Disabilities Act, whose intricacies aren't fully appreciated by some lawyers who study it for a living. I haven't even gotten to that part yet, but I'm sure it is, ironically, full of pitfalls and various other legalistic booby traps.

It looks distant on the horizon from here, but there still remains the possibility of class certification. Now, we plaintiffs are a part of the *Reid v. Wetzel* class, so we have some experience. But the law is clear on this: pro se litigants cannot represent a class. *Hagan v. Rogers,* 570 F.3d 146, 158-59 (3d Cir. 2009). We could probably cannibalize parts of the *Reid* motion for class certification, soup up the *commonality* part until it satisifies the *predominance* requirement for a (b)(3) damages class, and let the *superiority* argument make itself.

But then we'd run into the disability-based sub-class. Imagine a Venn diagram between the ADA and Fed.R.Civ.P. 23. In the middle section is where dragons live—who are invincible against all foolish pro se adventurers.

We should have counsel because this is a complex case, even moreso than *Reid*, where class counsel and the defendants both argued complexity in their respective memoranda* in support of approving the settlement. #18-CV-0176, docs. 101 and 102.

---

\* Hopefully I won't be judicially estopped from arguing complexity here, since I countered the proponents' complexity argument in my own brief *opposing* approval of the *Reid* agreement. Doc. 120 at 10-14. Of course, qualified immunity was not a potential defense in that injunction-only class action, which also did not feature ADA claims.

### 5. This case requires extensive discovery.

In *Reid*, class counsel had to review 23,500 documents, just to start. Doc. 102 at 17. Discovery was then cut short by negotiations and eventual settlement. But that's a rough indicator of how fact-intensive this case promises to be.

Given our continued incarceration, it will be impossible to investigate the case properly. DOC regulations allow us to possess just four records-center-sized boxes in our cells at any time. DC-ADM 815, § 3(B). It seems unlikely that the defendants will permit a dump truck full of documents to be delivered to Death Row.

Additionally, as the Third Circuit has observed, "discovery rules in the Middle District of Pennsylvania ae complex" and will be "difficult for [the plaintiffs] to contend with." *Tabron*, 6 F.3d at 158. There needs to be an intermediary for this reason alone. The weight of the discovery, combined with the heaviness of the legal issues, should combine to clinch the decision, I submit.

### 6. Experts will be required.

Again, this Court can look to *Reid* as an indicator. There, class counsel brought in an expert on the effect of solitary confinement: the illustrious, widely-published Dr. Craig Haney. Strangely, Dr. Haney won't answer my letters, but I bet "appointed counsel will have a much better opportunity to obtain an expert than would an indigent prisoner" like me. *Parham,* 126 F.3d at 460.

### 7. Credibility will be a factor.

Whichever expert(s) the plaintiffs can find could end up battling the defendants' expert(s). Even if not, there will definitely be disputed matters of fact—such as this

disgraceful canard that the CCU was reformed by 2018—that are likely to devolve into "swearing contests" from the witness stand. *Id.* We need professionals to cross-examine hostile corrections officials and get the most out of their mentally damaged clients on the witness stand.

## Conclusion

The Third Circuit tells us that "where a plaintiff's case appears to have merit and most of the aforementioned factors have been met, courts should make every attempt to obtain counsel." *Parham,* 126 F.3d at 461. That bit of language provides a clue to the real truth here: speaking of "appointment" of counsel is inaccurate. The most the Court can do is *seek* counsel on our behalf. And doing that mean drawing on the precious resources of the *pro bono* bar. We plaintiffs understand this.

We didn't make our "appointment" request until Magistrate Judge Mehalchick recommended that we should proceed past the pleading stage. We've been doing our best, pro se, fighting off the defendants' selective bullyragging. But we need help.

WHEREFORE, I respectfully implore this Honorable Court to grant our joint motion for "appointment" of counsel.

Respectfully submitted,

September 7, 2022

_____
**Richard A. Poplawski**
SCI Phoenix, # KB7354
1200 Mokychic Drive
Collegeville, PA 19426

## Certificate of Timely Filing

I certify, subject to the penalties of 28 U.S.C. § 1746, that the following is true:

- The plaintiffs submitted their joint motion for apppointment of counsel on **August 24, 2022**.

- According to M.D. Local Rule 7.5, papers supporting motions are due within 14 days of service. Thus, this brief is due **today, September 7, 2022**.

- This memo shall be placed in the prison mail receptacle, marked for pre-paid, first-class U.S. Mail **tonight, September 7, 2022**, at about 7PM.

- It will sit in the mailbox overnight and receive a postmark tomorrow. But it is timely filed according to the prison-mailbox rule.

## Certificate of Compliance - Word Count

According to M.D. Local Rule 7.8, this memorandum must certify compliance with the word-count limit of 5,000 words because it is over 15 pages.

The word-processing software used to compose this document (Microsoft Word*Pad*) does not have a word-count feature. But there's a method to estimate: with an average of 12 words on each line, and about 20 lines on each page (given headers, orphan-minding, etc.), there are surely less than **3840 words** on the preceding 16 pages.

## Certificate of Service

I certify that a copy of this *Memorandum in Support* has been served on counsel for the defendants via first-class U.S. Mail, postage pre-paid, on the date listed below:

**Kim Adams, Esq.**
PADOC Ofc. of Gen. Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

Respectfully—and timely—filed, certified, and served,

September 7, 2022

_____

**Richard A. Poplawski**
SCI Phoenix, # KB7354
1200 Mokychic Drive
Collegeville, PA 19426



Richard Poplawski
SCI Phx V#KB7354
1200 Mokychic Dr.
Collegeville PA 19426

RECEIVED
HARRISBURG, PA
SEP 1 2 2022
PER _____
DEPUTY CLERK

Placed in
mailbox on
Sept. 7
R.P

Clerk of the Court
U.S. Dist. Ct. for M.D. Pa.
228 Walnut St
P.O. Box 983
Harris., PA 17108

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

US POSTAGE $001.92